**Bernard MOORMAN, Thomas Beehan, Thomas Benton, Walter Bubenzer, Irvin Callery**

v.

**Albert WOOD, Kenton County Court Clerk.**

**Civ. A. No. 80–130.**

United States District Court, E. D. Kentucky, Covington Division.

Dec. 17, 1980.

Sheryl G. Snyder, Francis J. Mellen, Jr., Janet G. Marcum, Louisville, Ky., for plaintiffs.

Robert Ruberg, Covington, Ky., for Wood.

Frank A. Wichmann, Covington, Ky., for Ft. Wright.

Jonathan A. Mason, Covington, Ky., for Crescent Spgs.

## MEMORANDUM OPINION

BERTELSMAN, District Judge.

### FACTS[1]

The court is here presented with a constitutional attack on a state annexation statute. The exact counterpart of this controversy has apparently not been the subject of any other judicial decision.

The 1980 session of the Kentucky General Assembly enacted K.R.S. 81A.430,[2] which authorizes any city to designate for annexation a contiguous part of another city. If there is an objection, the matter can be placed on the ballot and the citizens of the annexation area then vote on the matter and a majority of those voting decide the issue.[3]

PLaintiffs here are citizens of the City of Covington, portions of which are sought to be annexed by the defendants, the smaller cities of Ft. Wright and Crescent Springs. Plaintiffs seek to block the annexation on the ground that K.R.S. 81A.430 is unconstitutional in that it contravenes their right to equal protection under the Fourteenth Amendment to the Constitution of the United States. They contend that the law must fall because it does not permit all of the voters of Covington to vote on what amounts to the deannexation of part of their city, a matter in which they claim a substantial interest.

The rationale of the 1980 annexation statutes cannot be understood in a vacuum. Some background is essential.

Annexation wars have been rife in Kentucky for generations. They have been the subject of particularly bitter controversies in the northern area of the state in which this court sits. This northern area is composed of some 50 cities, contained in three counties.[4] The largest of the cities, Covington, has a population of about 50,000 and the smallest contains only a few hundred residents.

It is important to an understanding of the statutes here involved and of this decision to grasp that these disputes have no racial overtones.[5] Nor do they usually involve conflicting class interests of wealth and poverty.

Although the plaintiffs here claim that the annexations are the result of the efforts of two "affluent subdivisions" to attempt to avoid their fair share of urban problems,

---

1. Formal findings of fact appear in Appendix A.

2. The full text of the relevant statutes appears in Appendix B.

3. A somewhat similar procedure is provided for the annexation of unincorporated area. *See* Appendix B, *infra.* Defendant Wood is the County Clerk, the official charged with holding the election.

4. The total population of the three counties is approximately 260,000. The area is principally urban or suburban and is a part of a larger metropolitan area consisting of the City of Cincinnati, Ohio, and its environs.

5. The black population of Northern Kentucky is between 1 and 3%. The Oriental and Hispanic populations are minute.

this is not always, nor even usually the case in local annexation controversies. The court has known citizens of an unincorporated area with no municipal services whatever and a blue collar population to resist annexation to an affluent city of 15,000 and, in another case, a ferocious court battle to be waged to resist annexation to a city with a population of 3,000 or less, where neither the annexors nor the annexees could be described as affluent.

Although, of course, there may be some desire to escape higher taxes and urban problems, in many instances, the motivation for resisting annexation in this vicinity is that many of the people like to live in their small towns where they can know the mayor, city council members and other officials personally, and where they can live their lives, as they see it, relatively free from regulation and have a direct voice in such municipal matters as zoning or the granting of a liquor license.

Where financial considerations are a primary motive in opposing annexations, frequently they involve a conscious desire to accept fewer municipal services as a trade off for lower taxes. For example, many of the smaller communities, both incorporated and unincorporated, keep taxes rather low by utilizing volunteer fire departments, part–time police forces, septic tanks instead of sewers, no city manager or engineer, etc.[6] From this point of view, the prevention of annexation enables those with limited financial resources better to own their own homes. To such people terms like "metro government" and "annexation" are calls to a holy war of resistance.

The annexing cities, on the other hand, are often motivated by a desire to expand their tax base and a perceived need to end the confusion and inefficiency which they contend results from the profusion of small government entities. The court expresses no opinion as to the wisdom of either of these positions. They are described here solely to explain the ·emotionally–charged dilemma with which the legislature was presented.

It is out of this history that the present controversy arises. In 1962 the City of Covington, certain citizens of which are individual plaintiffs here, commenced efforts to annex extensive unincorporated areas of Kenton County. At that time annexations were resisted in Kentucky by remonstrance suits, under which the state court in the context of an equitable action determined, under prescribed statutory tests, whether an annexation was appropriate.[7]

The 1962 annexation litigation worked its tortuous way through the courts until it finally concluded in 1979, with a decision in favor of the annexing City of Covington. The proceedings are too complicated even to attempt to describe here.[8] In 1979 Covington was ultimately successful in finalizing the annexation of these large unincorporated areas. Some of this territory which went to Covington at the conclusion of this 18 years of forensic hostilities is now sought to be detached from Covington and joined to Crescent Springs and Ft. Wright by what amounts to a preemptive strike.

This was made possible because such bitter animosities had been engendered by the prolonged conflict that the vanquished citizens of these areas, refusing to accept their defeat, set up a type of underground resistance movement, sought aid from the General Assembly of the Commonwealth and induced it to repeal the old annexation statutes and enact the one at issue here.

These citizens, who regard themselves as freedom fighters of a sort, then formed an alliance with the smaller cities of Ft. Wright and Crescent Springs to annex

---

**6.** To some extent these limitations are alleviated by entering into cooperative agreements with other municipalities or agencies. For example, a principal function of the Northern Kentucky Area Planning Commission is to provide planning services for cities which desire to contract with it. *See* K.R.S. 147.610.

**7.** *See* former K.R.S. 81.140 (repealed 1980).

**8.** *See* Straub, The Kentucky Post, October 18, 1980, for an in depth discussion of the history of annexation in the area. The court has ordered that this story be made part of the record as background.

them away from Covington under the new law.[9] The annexation was challenged by the filing of appropriate petitions, and the issue scheduled to be placed on the ballot at the general election of November 4, 1980, pursuant to the new statute. The plaintiffs here as citizens of Covington attacked the new law and sought to enjoin the holding of the election, claiming the statute violated their equal protection rights in that it did not permit all the citizens of Covington to vote in the annexation election, although all had a substantial interest in the result.[10]

A preliminary injunction was sought from, but denied by this court, and the election held. There were other annexation issues on the ballot, through which Covington was attempting to annex certain unincorporated areas of Kenton County. The results are in the margin. In interpreting them, it must be recalled that a vote *for* the Ft. Wright and Crescent Springs annexation is actually an *anti*-annexation vote with respect to the City of Covington.[11] As these results show, popular local enthusiasm for annexation to Covington is somewhat restrained.

## ISSUE

Thus the issue is presented:

Does a violation of the Equal Protection Clause of the Fourteenth Amendment result from the efforts of the legislature of the Commonwealth of Kentucky to resolve the difficult political problems of annexation by providing that the residents of an annexation area, to the exclusion of other affected citizens, decide by popular referendum the city in which they shall live?[12]

9. These annexations also include parts of Covington which were not included in the 1962 annexation.

10. The Ft. Wright annexation includes part of Covington's principal park. *See* note 32, infra.

11. ARE YOU IN FAVOR OF BEING ANNEXED TO THE CITY OF FT. WRIGHT?

> Fort Wright Ordinance 204-1980
>
> > YES... 504 votes
> > NO ... 18 votes
>
> Fort Wright Ordinance 217-1980
>
> > YES... 494 votes
> > NO ... 15 votes

ARE YOU IN FAVOR OF BEING ANNEXED TO THE CITY OF CRESCENT SPRINGS?

> Crescent Springs Ordinance 1980-38
>
> > YES... 108 votes
> > NO ... 2 votes
>
> Crescent Springs Ordinance 1980-39
>
> > YES... 16 votes
> > NO ... 2 votes

ARE YOU IN FAVOR OF BEING ANNEXED TO THE CITY OF COVINGTON?*

> Edgewood, Kentucky
>
> > YES... 48 votes
> > NO ... 3,783 votes
>
> Liberty Construction
>
> > YES ... 2 votes
> > NO ... 189 votes
>
> Decoursey Pike
>
> > YES ... 6 votes
> > NO ... 349 votes

*These latter three issues are not directly involved in this action, being proposed annexations of unincorporated area to Covington.

12. Plaintiffs judicially admitted at the outset of the hearing on the preliminary injunction that the statute was valid under state law and that it contains no ambiguities the resolution of which might make it unnecessary to decide the federal constitutional issue. Therefore, abstention was not appropriate. *Hanna v. Toner*, 630 F.2d 442 (6th Cir. 1980).

The resolution of this issue involves both the equal protection doctrine and principles of federalism. This court holds that the legislature's solution to the annexation quandary is not unconstitutional.

## JUSTICIABILITY

Defendants suggest that this case involves a non-justiciable controversy under the doctrine of *Hunter v. City of Pittsburgh*.[13] As the discussion which follows shows, the court does not regard that decision as one relating to the justiciability doctrine, but as one applying principles of federalism. Therefore, the court holds that this case is justiciable.

## PRINCIPLES OF FEDERALISM

It has been said that the division of powers between the branches of the federal government and between federal and state government is "the most central tenet of American constitutionalism." [14]

In the infancy of our Republic, great emphasis was placed on the autonomy of the states as a "barrier against the enterprises of ambition." [15]

"At the outset, only a small number of explicit substantive limitations on the exercise of governmental authority were thought essential; in the main, it was believed that personal freedom could be secured more effectively by decentralization than by express command. From the thought of seventeenth century English liberals, particularly as elaborated in eighteenth century France by Montesquieu, the Constitution's framers had derived the conviction that human rights could best be preserved by inaction and indirection–shielded behind the play of deliberately fragmented centers of countervailing power, in a vision almost Newtonian in its inspiration." [16]

In the context of municipal government, this principle is best exemplified by *Hunter v. City of Pittsburgh*.[17] *Hunter* was an annexation case, exhibiting some of the conflicting policy problems found in the case at bar. There, the court held a statute of the State of Pennsylvania, providing for the merger of contiguous cities, constitutional under the Fourteenth Amendment, where the votes of both the larger and smaller cities were pooled, thus in effect giving the larger city the right to annex the smaller one contrary to the will of a majority of its citizens. In language that has been much quoted and frequently construed, the Court said:

"We think the following principles . . . have become settled doctrines of this court, to be acted upon wherever they are applicable. Municipal corporations are political subdivisions of the State, created as convenient agencies for exercising such of the governmental powers of the State as may be entrusted to them. For the purpose of executing these powers properly and efficiently they usually are given the power to acquire, hold, and manage personal and real property. The number, nature and duration of the powers conferred upon these corporations and the territory over which they shall be exercised rests in the absolute discretion of the State. Neither their charters, nor any law conferring governmental powers, or vesting in them property to be used for governmental purposes, or authorizing them to hold or manage such property, or exempting them from taxation upon it, constitutes a contract with the State within the meaning of the Federal Constitution. The State, therefore, at its pleasure may modify or withdraw all such powers, may take without compensation such property, hold it itself, or vest it in other agencies, expand or contract the territorial area, unite the whole or a

13. 207 U.S. 161, 28 S.Ct. 40, 52 L.Ed. 151 (1907).

14. L. Tribe, American Constitutional law 1–2 (1978) [hereinafter cited as Tribe].

15. *Id.* at 2; The Federalist No. 46. *See generally*, Tribe, Chapter 2.

16. *Id.* at 2.

17. *See* Note 13, *supra*.

part of it with another municipality, repeal the charter and destroy the corporation. All this may be done, conditionally or unconditionally, with or without the consent of the citizens, or even against their protest. In all these respects the State is supreme, and its legislative body, conforming its action to the state constitution, may do as it will, unrestrained by any provision of the Constitution of the United States. *Although the inhabitants and property owners may by such changes suffer inconvenience, and their property may be lessened in value by the burden of increased taxation, or for any other reason, they have no right by contract or otherwise in the unaltered or continued existence of the corporation or its powers, and there is nothing in the Federal Constitution which protect them from these injurious consequences.* The power is in the State and those who legislate for the State are alone responsible for any unjust or oppressive exercise of it." [18]

The judicial exegesis on the text of *Hunter* has been inconsistent. Some courts have considered *Hunter* as a political question decision, similar to the decisions of the Supreme Court prior to *Baker v. Carr.*[19] These courts have implied that the case is a dead letter,[20] because of the decision in

*Baker* and others which have developed its doctrine.[21]

Other cases have stated that the thrust of *Hunter* is negated by subsequent voting rights and discrimination cases.[22]

Many recent cases, however, have rejuvenated *Hunter.* In *Holt Civic Club v. Tuscaloosa,* the Supreme Court stated that, although *Hunter* was subject to the voting right cases, it "continues to have substantial constitutional significance in emphasizing the extraordinarily wide latitude that states have in creating the various types of political subdivisions and conferring authority upon them." [23]

This court's reading of *Hunter* is not that it concerned political questions in the sense of the justiciability doctrine, but rather that it has to do with the principles of division of powers between the state and federal government, and is a "political question" decision only in that sense. *Hunter's* holding was not that an annexation question is non-justiciable under the Federal Constitution, but—in more modern constitutional parlance—that there is no property right or liberty interest [24] in living within a particular political subdivision. Thus, a state statute directly placing a citizen in a particular city or county, or changing by the redraw-

---

**18.** 207 U.S. at 178–179, 28 S.Ct. at 46–47 (emphasis added).

**19.** 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962) (overruling cases which denied justiciability of disputes concerning malapportionment of state legislatures).

**20.** *See* articles in note 40, *infra. But see Detroit Edison Company v. East China Township School District No. 3,* 247 F.Supp. 296 (E.D.Mich.1965) aff'd 378 F.2d 225 (6th Cir. 1967). *Murphy v. Kansas City,* 347 F.Supp. 837, 840 (W.D.Mo.1977); *Cf. Deane Hill Country Club v. City of Knoxville,* 379 F.2d 321 (6th Cir. 1967), cert. den. 389 U.S. 975, 88 S.Ct. 476, 19 L.Ed.2d 467 (1967) which stated that *Hunter* precluded a constitutional challenge to an annexation because it was a "political matter."

**21.** For a discussion of the present status of the political question doctrine, *see* Tribe § 3–16.

**22.** *See Hayward v. Clay,* 573 F.2d 187 (4th Cir. 1978); *Garren v. City of Winston–Salem,* 463 F.2d 54 (4th Cir. 1972); *Adams v. City of Colo-*

*rado Springs,* 308 F.Supp. 1397 (D.Col.1970), aff'd 399 U.S. 901, 90 S.Ct. 2197, 26 L.Ed.2d 555 (1970). In *Gomillion v. Lightfoot,* 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110 (1960), the court held that *Hunter* could not be used to uphold a gerrymander, deliberately designed to de–annex the black citizens of a city, thus excising them from the city's electorate.

**23.** 439 U.S. 60, 71, 99 S.Ct. 383, 391, 58 L.Ed.2d 292 (1978). *See also Town of Lockport v. Citizens for Community Action,* 430 U.S. 259, 271, 97 S.Ct. 1047, 1055, 51 L.Ed.2d 313 (1977). In *Berry v. Bourne,* 588 F.2d 422, 424 (4th Cir. 1978), the court stated that *Hunter* continued in full force and effect, the single exception to its rule being "confined to challenges resting on alleged racial discrimination." See discussion of the voting rights cases in the following section of this opinion.

**24.** *Cf. Board of Regents v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972).

ing of boundary lines the political subdivision in which he resides, or providing some procedure where that may be done, may not be attacked under the due process or equal protection clauses of the Fourteenth Amendment, except in certain very restricted circumstances.

As standing for this precept, *Hunter* is still good law, except where its force may be overcome by the counterthrust of the voting rights decisions, or those involving the realignment of political subdivisions for invidious racial motives or in other situations involving a clear denial of due process or equal protection.

As applied to annexation elections, an analysis of the facts of all the cases cited by the parties or found by the court indicates that, so long as the residents of the affected areas are treated alike within those areas, statutory provisions for a wide variety of voting schemes will be upheld against an equal protection attack, and the vote of one *area* may be give more weight than that of the other, or the franchise may even be granted to one area and denied to another if a rational basis exists for so providing.[25] These cases dovetail with the view of the voting rights cases that *residence* is a legitimate criterion for limiting the right to vote, as discussed in the next section of this opinion.

In the last analysis, what these cases are saying is that annexation has its pros and cons, and is a political question in the sense that under our Constitution's principles of federalism, it is the prerogative of the individual states to resolve the conflicting interests involved in annexation disputes as they see fit. It is true that the prerogative is subject to limitations of equal protection and due process, but *Hunter* requires that these limitations be interpreted in the light of that federalism.

As the next section of this opinion shows, equal protection rights have not been violated, and the resolution the Commonwealth of Kentucky has made of the conflicting political interests involved in annexation controversies, by submitting the matter to a plebiscite of the residents of the annexation area, must be respected by this court.

## EQUAL PROTECTION

Plaintiffs present this case as a voting rights case. They argue that the fact that the new annexation statute permits only the residents of the areas sought to be annexed to vote on an annexation violates plaintiffs' right of equal protection. Plaintiffs' rationale is that, as citizens of the City of Covington, they are substantially affected by the loss of these areas to that city, and that the statute is unconstitutional in depriving them of a right to vote on the matter.[26] But in all the voting cases, it was conceded that the right to vote could be

---

25. *See Hunter v. City of Pittsburgh*, 207 U.S. 161, 28 S.Ct. 40, 52 L.Ed. 151 (1907) (larger city could annex smaller, votes of both being pooled); *Hayward v. Edwards*, 456 F.Supp. 1151 (D.S.C.1977) aff'd *Hayward v. Clay*, 573 F.2d 187 (4th Cir. 1978) (annexing and annexed areas voted separately, approval of voters of each could be required, but freeholders of annexed area could not be given veto); *Murphy v. Kansas City*, 347 F.Supp. 837 (W.D.Mo.1970) (annexing city only has vote, citizens of area to be annexed have no vote). In cases involving annexation schemes where no election was provided, courts have invoked a similar principle in upholding various statutory plans. *See Deane Hill Country Club v. City of Knoxville*, 379 F.2d 321 (6th Cir. 1967), cert. den. 389 U.S. 975, 88 S.Ct. 476, 19 L.Ed.2d 467 (1967); *Berry*

*v. Bourne*, 588 F.2d 422 (4th Cir. 1978); *Wilkerson v. City of Coralville*, 478 F.2d 709 (8th Cir. 1973); *Jimenez v. Hidalgo County Water Improvement District No. 2*, 68 F.R.D. 668 (S.D. Tex.1975); *Adams v. City of Colorado Springs*, 308 F.Supp. 1397 (D.Col.1970), aff'd 399 U.S. 901, 90 S.Ct. 2197, 26 L.Ed.2d 555 (1970).

26. Plaintiffs rely on *Kramer v. Union Free School District No. 15*, 395 U.S. 621, 89 S.Ct. 1886, 23 L.Ed.2d 583 (1969); *Hill v. Stone*, 421 U.S. 289, 95 S.Ct. 1637, 44 L.Ed.2d 172 (1975); *City of Phoenix v. Kolodziejiski*, 399 U.S. 204, 90 S.Ct. 1990, 26 L.Ed.2d 523 (1970); *Evans v. Cornman*, 398 U.S. 419, 90 S.Ct. 1752, 26 L.Ed.2d 370 (1970); *Cipriano v. City of Houma*, 395 U.S. 701, 89 S.Ct. 1897, 23 L.Ed.2d 647 (1969); *Cf., Carrington v. Rash*, 380 U.S. 89, 85 S.Ct. 775, 13 L.Ed.2d 675 (1965).

limited to the residents of the governmental unit or area concerned.[27]

Plaintiffs contend that the right to vote is a fundamental right, the denial of which is subject to the equal protection strict scrutiny test, rather than the less stringent rational basis test.[28] In annexation elections, this is true in regard to classifying residents of a given area, but in granting the franchise to residents of one area, and denying it to those of another area, or giving the votes of different areas different weight, the less stringent rational basis test is the test that has been employed.[29]

Defendants argue that it is not a denial of equal protection to limit the right to vote to residents of an affected area and that an annexation election is a special interest election in which it is permissible to permit only those specially affected to vote.[30]

Neither the plaintiffs' nor the defendants' line of cases exactly fits the present situation. Plaintiffs, although they recognize that the right to vote may be limited to residents of "the geographic confines of the governmental entity concerned," [31] argue

that governmental entity is the entire City of Covington, rather than just the areas sought to be detached therefrom.[32] They contend further that the cases permitting classification of voters in special interest elections are not applicable, because they concerned special purpose districts, rather than a municipal entity of general governmental powers, such as a city.

Construing the equal protection clause in the light of the principles of federalism discussed in the preceding part of this opinion, this court holds that defendants have the better of the argument, that these annexation elections are special interest elections,[33] and that there is not only a rational basis, but a compelling state interest for limiting the right to vote in them to the residents of the annexation area.

The overall purpose of the equal protection clause is to preserve the dignity of the individual by protecting him from invidious prejudicial treatment at the hands of his government.[34] This is the reason why classifications which burden fundamental rights or suggest prejudice against

27. See discussion in *Holt Civic Club v. Tuscaloosa*, 439 U.S. 60, 99 S.Ct. 383, 58 L.Ed.2d 292 (1978).

"Perhaps the most striking exception to the constitutional presumption against interest-based restrictions on the franchise is a rule so well established that it is rarely conceived as an 'exception' at all: the rule that a state or municipality may restrict the franchise to its bona fide residents." Tribe § 13–12. *See also* annexation cases in note 25, *supra*;

28. See Tribe at 1102.

29. *Adams v. City of Colorado Springs*, 308 F.Supp. at 1403, affd. 399 U.S. 901, 90 S.Ct. 2197, 26 L.Ed.2d 555 (1970); *Murphy v. Kansas City*, 347 F.Supp. at 845. *Cf. Holt Civic Club v. Tuscaloosa*, 439 U.S. at 73–4, 99 S.Ct. at 391–392. *See Town of Lockport v. Citizens for Community Action*, 430 U.S. at 271, 97 S.Ct. at 1055; *Hayward v. Edwards*, 456 F.Supp. at 1154–55.

30. *Cf. Salyer Land Co. v. Tulare Lake Basin Water Storage District*, 410 U.S. 719, 93 S.Ct. 1224, 35 L.Ed.2d 659 (1973); *Town of Lockport, New York v. Citizens for Community Action*, 430 U.S. 259, 97 S.Ct. 1047, 51 L.Ed.2d 313 (1977).

31. *Holt Civic Club v. Tuscaloosa*, 439 U.S. at 68, 99 S.Ct. at 389.

32. The plaintiffs particularly rely on the fact that the Ft. Wright annexation includes a portion of Devou Park, Covington's principal municipal park. All of the citizens of Covington, they assert, have a particular interest in the Ft. Wright annexation for this reason since they will be "deprived" of their park. However, the fact that property owned by a municipality will be included in an annexation has been accorded no special constitutional significance. *See Hunter v. City of Pittsburgh*, 207 U.S. 161, 28 S.Ct. 40, 52 L.Ed. 151 (1907). Nor will the citizens of Covington be "deprived" of the park because the city owns it in fee, and it can still be used for park purposes. It is not unusual for a municipality to own real property situated outside its boundaries.

33. *Lockport, supra*, says in dicta that an annexation is the classic example of a special interest election where certain citizens have a more substantial interest in the outcome than other affected persons, and thus the franchise may properly be restricted to residents of that area in an annexation election. 430 U.S. at 271, 97 S.Ct. at 1055.

34. See Tribe at 993.

minorities are subjected to strict scrutiny.[35] In the present case, since there is no suggestion of a suspect classification such as race, the strict scrutiny of the court is directed to whether the fundamental right of the citizen to reasonably equal participation in his government has been unduly burdened by the statute at issue. The court holds that it has not.

It has always been recognized that there must be some restrictions on the franchise.[36] Nor has the Supreme Court ever demanded that a voting scheme disregard residence.[37] The case at bar well illustrates the justification of the residency requirement.

Not only a rational basis, but a compelling state interest for the new statute is found in the following considerations. First, annexation battles, in this part of the state at least, were tearing the community apart and generating hostility to such a degree that some solution had to be found. The point had been reached where, even after it had been determined that an area was to be annexed to a particular city, harmony was destroyed, and the annexed citizens were devoting substantial civic energies to reversing the annexation. The procedure of committing annexation problems to the judiciary had not worked. The judiciary, the legislature apparently concluded, was not suited for the task of regulating annexations. There was no reason to believe an administrative procedure would work any better, and it would only result in returning the matter to the judiciary once again, because the Constitution of Kentucky guarantees judicial review of administrative action.[38]

Therefore, the state had a compelling interest in finding some way to provide a fast, certain answer to annexation controversies. Experience demonstrated that such an immediate, certain solution, which would avoid years of litigation and uncertainty as to the status of a given area,[39] was more desirable than one which nicely balanced all the relevant theoretical considerations of political science, but at the cost of decade–long, bitterly divisive court battles.

The legislature determined that voting is a workable answer. Having chosen voting as the best available, though certainly not a perfect solution to the problem of resolving annexation controversies, the state also had a compelling interest in limiting the right to vote in annexation elections to residents of the geographic area of the proposed annexation. The answer to plaintiffs' argument that all of the residents of the City of Covington must be given the right to vote, because they are substantially affected, is the same as that given by the Court in *Holt Civic Club v. Tuscaloosa, supra*, to a similar argument, that is, that such an argument proves too much.

Many persons other than residents of the annexation areas have a substantial interest at least equal to that of the citizens of Covington in the outcome of these annexations. A non–resident who works in an area may be subjected to or relieved from a substantial payroll tax. A non–resident who owns a valuable piece of real property in an area may find the tax rate imposed on it substantially altered by the annexation. In the present case, the citizens of the cities to which the annexed areas are sought to be attached have a substantial interest. In the annexation of an unincorporated area, the citizens of the county would have a very real interest. In fact, since the three counties of Northern Kentucky are in essence

---

**35.** *Id.* at 1101.

**36.** *Id.* at 761.

**37.** *Id.* at 1007; *Cf. Holt Civic Club v. Tuscaloosa*, 439 U.S. 60, 99 S.Ct. 383, 58 L.Ed.2d 292 (1978).

**38.** *American Beauty Homes Corp. v. Louisville*, 379 S.W.2d 450 (Ky.1964).

**39.** Some of the territory involved in the instant case was for a number of years considered to be in Ft. Wright, because while Covington's annexation attempt was held in abeyance by a remonstrance suit, the City of Ft. Wright undertook its own annexation, which was not opposed, and apparently became final. The state courts had to resolve the problem and ultimately held that Covington had obtained what amounted to a binding option by enacting its ordinance first.

one integral metropolitan area, all of its citizens may be more than minimally affected by the results of these annexations. Once you go beyond the residents of the annexation area, where are you going to stop?[40]

Such considerations as these explain why residence has always been recognized as a proper criterion for defining voting rights. It is impossible to permit everyone who is affected by an election of any kind to vote. Therefore, in the context of most elections the limitation of the franchise to residents satisfies a compelling state interest per se.[41]

A further factor in upholding the statute attacked here is that an annexation election is a "single–shot" referendum election.

"The principles 'applicable in gauging the fairness of an election involving the choice of legislative representatives' have been deemed 'of limited relevance . . . in analyzing the propriety of recognizing distinctive voter interests in a 'single–shot' 'referendum' where voter will is expressed directly rather than through elected representatives, and where the existence of a single, discrete issue makes it far easier 'to determine whether its adoption or rejection will have a disproportionate impact on an identifiable group of voters'."[42]

# CONCLUSION

It can be argued that liberal annexation is the most practical solution to our pressing urban problems and that to permit people to fence themselves off in suburban enclaves is to guarantee lack of interest in these problems, to facilitate the erosion of the core areas, and to promote urban blight and racial and class strife.

Those who oppose such arguments contend that size in municipal government is no guarantor of efficiency, that smaller towns or unincorporated communities are more in accord with democracy, and indeed that almost pure democracy, as exemplified by the New England town meeting, can be approached there. They cite stories of illegal public employee strikes and the inefficiencies inherent in bureaucratic government in support of their opposition to metropolitan government.

In short, there is much to be said both for and against liberal annexation procedures. Plaintiffs here claim that the statute under attack authorizes a war of attrition by the smaller surrounding cities against the core city, but this assumes that the outlying areas of Covington are eager to be detached from it. Perhaps the legislature believed that submitting annexation questions to a vote would require the core cities to do a

---

**40.** The court has considered the comment in Note, *The Right to Vote in Municipal Annexations*, 88 Harv.L.Rev. 1571, 1609 (1975), and Note, *Annexation Elections and the Right to Vote*, 20 U.C.L.A.L.Rev. 1093 (1973) and has found many of the considerations pointed out there helpful in reaching this decision. Both generally agree that it is impractical, if not impossible, to find some manner in which everyone who has a substantial stake in the outcome of an election, residents and non–residents alike, may be permitted to vote. This court, however, disagrees with the conclusions of the articles that elections cannot be employed for this reason. Rather, this court holds that the inability to formulate a practical way to permit all of those who have a substantial stake in the outcome of an annexation election to vote therein, provides a compelling state interest for limiting the voting to the residents of the annexation area.

**41.** An analogy may be found in the problem of establishing a proper minimum voting age. All are agreed that a minimum age standard is

perfectly legitimate, but it is difficult to imagine any compelling reason for choosing 18 years rather than 19 years, or 20 years, as a standard. Such cases, it has been suggested, ought to be resolved by applying the strict equal protection standard only to the general type of limitation, while examining any specific example of the limitation under the traditional rational or reasonable basis approach. U.C.L.A. Article, *supra* n. 40, at 1112, note 90. Comment, *Limitations on the Voting Franchise and the Standard of Kramer v. Union Free School District No. 15*, 1970 Utah L.Rev. 143, 147.

**42.** Tribe § 13–17, quoting from *Town of Lockport, New York v. Citizens for Community Action at the Local Level, Inc.*, 430 U.S. 259, 97 S.Ct. 1047, 51 L.Ed.2d 313 (1977). (In election for adoption of county charter, it was not unconstitutional to require approval by majority of both county residents and city residents).

better selling job, and indeed be more efficient. The legislature might also have meant to encourage cities to work out plans for consolidation of services.

It should be noted that in the annexation of unincorporated territory, the legislature weighted the scales heavily in favor of annexation, requiring a vote of 75 percent of all the registered voters in an area to defeat it. This again exemplifies a nice balancing of conflicting political interests with which a federal court has no authority to interfere.

Advocates of each side of this controversy are unlikely to be convinced by the arguments of those of the opposing persuasion. What *Hunter* and the similar cases cited herein are saying is that these difficult policy problems of local government are matters for the individual states to resolve, and the federal courts should stay out of them if principles of due process and equal protection are observed, as construed in light of federalism.

The Constitution of the United States enacts neither principles of consolidated metropolitan government [43] nor those of decentralized government in villages and small towns. It is silent on these subjects. It grants the federal courts no power to construct solutions to urban blight or suburban sprawl, or to invalidate solutions reached by a state, if racial discrimination or some other unconstitutional factor is not involved.

Our Constitution's principles of federalism guarantee to the states the right to experiment [44] with various solutions to these problems in the context of purely local criteria. If the experiment challenged in this case does not work, undoubtedly the state will repeal it and try another.

Under such principles of federalism, the strictures of equal protection having been observed, the new annexation procedure of the Commonwealth of Kentucky, as it concerns the annexation of part of one city by another, cannot be struck down by this court. Therefore, the complaint must be dismissed,

A judgment to that effect is this day entered.

## APPENDIX A

### FINDINGS OF FACT

1. Plaintiffs bring this action pursuant to 42 U.S.C. § 1983 alleging deprivation of rights secured by the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution.

2. Jurisdiction is conferred upon the court by 28 U.S.C. § 1343(3) and (4) which provide for original jurisdiction of the court in an action brought pursuant to 42 U.S.C. § 1983.

3. The plaintiffs are all residents of and registered voters in the City of Covington who do not reside in the areas of that city which the City of Ft. Wright and the City of Crescent Springs seek to annex.

4. In spring of 1980 the General Assembly of the Commonwealth of Kentucky adopted a new statutory scheme concerning annexation. A portion of that statutory scheme, K.R.S. 81A.430 reads as follows:

"(1) Whenever a city desires to annex all or part of a city of the second, third, fourth, fifth or sixth class, the legislative body of the city proposing to annex shall enact an ordinance stating the intention of the city to annex. Such ordinance shall accurately define the boundary of the city or portion thereof proposed to be annexed, declaring it desirable to annex the city or portion thereof and providing that the question of annexation shall be submitted to the qualified voters of the city or portion thereof to be annexed at the next regular election. The major of the city proposing to annex shall certify the action of the city to the county clerk,

---

**43.** *Cf.* Justice Holmes' epigram in his famous dissent in *Lochner v. New York*, 198 U.S. 45, 25 S.Ct. 539, 49 L.Ed. 937 (1905) that the Constitution "does not enact Mr. Herbert Spencer's Social Statics," 198 U.S. at 75, 25 S.Ct. at 393.

**44.** *Cf. Holt Civic Club v. Tuscaloosa*, 439 U.S. 60, 75, 99 S.Ct. 383, 393, 58 L.Ed.2d 292 (1978). *See* Tribe § 5–20.

who shall have printed on the ballots provided for use in the city or portion thereof proposed to be annexed, the question: 'Are you in favor of annexing to the City of _____?' If a majority of those voting on the proposition favor annexation, the city proposing to annex shall pass an ordinance declaring the other city or portion thereof annexed, and that city or portion thereof shall then be a part of the annexing city."

5. On March 14, 1980, the City Council of the City of Ft. Wright acting pursuant to K.R.S. 81A.430 passed ordinance 204–1980 proposing to annex certain territory which is a part of the City of Covington which lies to the north and west of the City of Ft. Wright.

6. On August 27, 1980, the City Council of the City of Ft. Wright passed pursuant to 81A.430 ordinance 217–1980 which called for the annexation of the same land as ordinance 204–1980 with an additional tract of land.

7. The part of Covington which the City of Ft. Wright proposes to annex includes a residential subdivision called the General Drive area and a portion of Covington's principal municipal park, Devou Park.

8. On September 9, 1980, the City Council for the City of Crescent Springs passed an ordinance pursuant to K.R.S. 81A.430 proposing to annex a part of the City of Covington adjacent to the City of Crescent Springs.

9. The part of Covington which the City of Crescent Springs proposes to annex consists of two separate residential subdivisions located in or near what is generally called Country Squire Estates.

10. Pursuant to K.R.S. 81A.430 the Albert Wood, Kenton County Court Clerk, is obligated to place on the ballot in the areas the City of Ft. Wright and the City of Crescent Springs proposes to annex the question: "Are you in favor of annexing to the City of Ft. Wright?" and "Are you in favor of annexing to the City of Crescent Springs?" in the relevant sections, unless enjoined or restrained by this court.

11. No racial motives or overtones.

12. These areas were part of an area which was the subject of protracted litigation over an extended period in the state courts.

APPENDIX B

BALDWIN'S 1980 KENTUCKY
ACTS ISSUE

CHAPTER 303

(H.B. 20)

AN ACT relating to local government.

*Be it enacted by the General Assembly of the Commonwealth of Kentucky:*

[*The following sections assigned to Chapter 81A by Reviser of Statutes*]

SECTION 1. A NEW SECTION OF KRS CHAPTER 81 IS CREATED TO READ AS FOLLOWS:

81A.400 The boundaries of any city other than a city of the first class shall remain as established by law until changed as provided in KRS chapter 81. The legislative body of any city other than a city of the first class may annex any city or portion of any city of the second through sixth class, or unincorporated territory or reduce the boundaries of the city under the provisions of this Act.

SECTION 2. A NEW SECTION OF KRS CHAPTER 81 IS CREATED TO READ AS FOLLOWS:

81A.410 (1) A city legislative body may extend the city's boundaries to include any area:

(a) Which is adjacent or contiguous to the city's boundaries at the time the annexation proceeding is begun; and

(b) Which by reason of population density, commercial, industrial, institutional or governmental use of land, or subdivision of land, is urban in character or suitable for development for urban purposes without unreasonable delay.

(2) No part of the area to be annexed shall be included within the

boundary of another incorporated city, except as provided in Section 4 of this Act.

(3) If a city is considering the annexation of two (2) or more areas which are all adjacent to the city boundary but are not adjacent to one another, it may undertake simultaneous proceedings under the authority of Section 3 or 4 of this Act for the annexation of such areas.

SECTION 3. A NEW SECTION OF KRS CHAPTER 81 IS CREATED TO READ AS FOLLOWS:

81A.420   (1) Whenever a city desires to annex unincorporated territory, the legislative body of the city proposing to annex shall enact an ordinance stating the intention of the city to annex. Such ordinance shall accurately define the boundary of the unincorporated territory proposed to be annexed, and declare it desirable to annex the unincorporated territory.

(2) If following the publication of the annexation ordinance pursuant to subsection (1) of this section and within sixty (60) days thereof, or if in any annexation proceeding where the annexing city has not adopted a final annexation ordinance, within sixty (60) days following the effective date of this Act, fifty percent (50%) of the resident voters or owners of real property within the limits of the territory proposed to be annexed petition the mayor in opposition to the proposal, an election shall be held at the next regular election occurring at least sixty (60) days after the petition is presented to the county clerk.

(a) The mayor of the city shall deliver a certified copy of the ordinance to the county clerk of the county in which the territory proposed to be annexed is located, who shall have printed on the ballot provided for use in each precinct embraced in whole or in part within the territory proposed to be annexed the question "Are you in favor or being annexed to the City of _____?" if

only a part of any precinct is embraced within the territory proposed to be annexed only persons who reside within the territory proposed to be annexed shall be permitted to vote. The clerk shall cause the sheriff or sheriffs to deliver to the election officers in each precinct in the appropriate counties copies of the ordinance proposing to annex.

(b) If less than seventy-five percent (75%) of the qualified voters in the area to be annexed oppose annexation, the unincorporated territory shall become a part of the city.

(c) If seventy-five percent (75%) or more of the qualified voters in the area to be annexed oppose annexation, the ordinance proposing annexation shall become ineffectual for any purpose.

(3) In not less than sixty (60) days after the enactment of the ordinance, if no petition has been received by the mayor as set out herein, or within sixty (60) days of the certification of election results in which less than seventy-five percent (75%) of the qualified voters in the area opposed annexation, the legislative body may enact an ordinance annexing to the city the territory described in the ordinance. Upon the enactment of this ordinance, the territory shall become part of the city for all purposes.

SECTION 4. A NEW SECTION OF KRS CHAPTER 81 IS CREATED TO READ AS FOLLOWS:

81A.430   (1) Whenever a city desires to annex all or part of a city of the second, third, fourth, fifth or sixth class, the legislative body of the city proposing to annex shall enact an ordinance stating the intention of the city to annex. Such ordinance shall accurately define the boundary of the city or portion thereof proposed to be annexed, declaring it desirable to annex the city or portion thereof and providing that the question of annexation shall be submitted to the qualified voters of the city or portion thereof to be annexed at

the next regular election. The mayor of the city proposing to annex shall certify the action of the city to the county clerk, who shall have printed on the ballots provided for use in the city or portion thereof proposed to be annexed, the question: "Are you in favor of annexing to the City of _____?" If a majority of those voting on the proposition favor annexation, the city proposing to annex shall pass an ordinance declaring the other city or portion thereof annexed, and that city or portion thereof shall then be a part of the annexing city.

SECTION 5. A NEW SECTION OF KRS CHAPTER 81 IS CREATED TO READ AS FOLLOWS:

**81A.440** A city may reduce its boundaries by following the procedure outlined in Section 4 for annexing territory.

SECTION 6. A NEW SECTION OF KRS CHAPTER 81 IS CREATED TO READ AS FOLLOWS:

**81A.450** (1) Whenever a city annexes another city, the annexing city shall be bound for all the debts and liabilities, and shall be the owner of all corporate property, franchises and rights, of the annexed city. If only a part of another city is annexed, the annexing city shall be liable for that proportion of the debts of the other city which the value of the real estate in the part of the city annexed bears to the value of all the real estate in the city, according to the latest assessment by the property valuation administrator.

(2) Whenever any unincorporated territory or part of a city is annexed by a city, the annexing city shall be liable for any indebtedness that is attached to or exists against the territory or part of a city by reason of the same being then or previously a part of any taxing district, and the annexing city shall assume the liability, so that after annexation the burden of taxation shall be uniform throughout the city.

SECTION 7. A NEW SECTION OF KRS CHAPTER 81 IS CREATED TO READ AS FOLLOWS:

**81A.460** If a proposal by a city to annex all or part of another city or unincorporated territory, or to reduce its boundaries is rejected by the voters of the city or territory proposed to be annexed or stricken, no further steps to annex or strike the same city or territory shall be taken within five (5) years from the date of rejection, nor shall the question of annexation or striking off be again submitted within that period.

SECTION 8. A NEW SECTION OF KRS CHAPTER 81 IS CREATED TO READ AS FOLLOWS:

**A.470** Whenever the limits of a city are enlarged or reduced, the city shall cause an accurate map of the annexed or severed area with a metes and bounds description, together with a copy of the ordinance duly certified, to be recorded in the office of the county clerk of the county or counties in which the city is located and in the office of the secretary of state.

SECTION 9. A NEW SECTION OF KRS CHAPTER 96 IS CREATED TO READ AS FOLLOWS:

**96.539** Any water or sewer utility owned by a city shall develop rules to govern extensions of service to unserved customers and areas. These rules may require that the applicant or applicants for new service pay to the utility all or part of the cost of extending utility lines. Where such payment is required, however, the cost of any extension greater than one hundred feet per applicant shall be subject to refund by the utility on a prorated basis for each additional customer whose service line is directly connected to the extension line paid for by the initial applicant or applicants. The refund period shall extend at least ten years, and in no case shall the refund amounts exceed the amount paid. Nothing in this section shall be construed to prevent a water or sewer utility from adopting extension or refund policies which are more lenient to customers than are herein specified.

[*The following sections assigned to Chapter 81A by Reviser of Statutes*]

SECTION 10. A NEW SECTION OF KRS CHAPTER 81 IS CREATED TO READ AS FOLLOWS:

**81A.480** The provisions of this Act shall apply in any annexation proceeding in which the annexing city has not adopted a final annexation ordinance by the effective date of this Act.

SECTION 11. A NEW SECTION OF KRS CHAPTER 81 IS CREATED TO READ AS FOLLOWS:

**81A.490** Notwithstanding any other provision in this Act, all rights of the utilities providing utility services in any area annexed by a city prior to the annexation, existing under other statutes, laws, or regulations are hereby expressly preserved.

SECTION 12. A NEW SECTION OF KRS CHAPTER 81 IS CREATED TO READ AS FOLLOWS:

**81A.050** Any city of the first class which proposes to annex territory pursuant to KRS 81.100 or 81.120 shall, prior to the enactment of the first ordinance, hold public hearings as provided in Section 13 of this Act and prepare a report setting forth the plans for the extension of services to the area proposed to be annexed. The report shall include:

(1) A map of the city and adjacent territory to show the following information:

(a) The present and proposed boundaries of the city;

(b) The present streets, major trunk water mains, sewer interceptors and outfalls as well as other utility lines;

(c) The present areas receiving, or able to receive, major city services, and the proposed extension of such services to other areas; and

(d) The prevailing general land use patterns existing in the area to be annexed.

(2) A statement showing that the area to be annexed meets the requirements of KRS 81.100 or 81.120.

(3) A statement setting forth the plans of the city for extending to the area to be annexed each major city service owned by the city or subsidized through city tax revenues and performed within the city at the time of annexation. Such statement shall:

(a) Provide for extending police and fire protection, garbage collection, and street maintenance services to the area to be annexed on the date of annexation, on substantially the same basis and in the same manner as such services are provided within the boundaries of the city prior to annexation;

(b) Provide for extension, into the area to be annexed, of streets and of major trunk water mains, sewer outfall lines, and lines for such utility services as the city provides to existing city residents and legally may provide in the annexed area, so that when such streets and utility lines are constructed, property owners in the area to be annexed will be able to secure the services, according to the policies in effect in the city for extending the services to individual lots or subdivisions; and shall name the government proposed to be responsible under the plans for any streets or form a boundary of the area to be annexed;

(c) Set forth a proposed timetable for the extension of, and if necessary, the construction for each major city service;

(d) Set forth a projected estimation of tax rates pursuant to Section 14 of this Act to be levied by the city upon the area to be annexed and affected residents of that area for each year until such time that all major city services have been provided; and

(e) Set forth the method under which the city plans to finance extension of services into the area to be annexed.

SECTION 13. A NEW SECTION OF KRS CHAPTER 81 IS CREATED TO READ AS FOLLOWS:

**81A.060** (1) After the preparation of the report required by Section 12 of this Act, any city of the first class proposing annexation shall hold at least two (2) public hearings on the proposed annexation prior to the enactment of the first ordinance. Additional hearings may be held. Notice of such hearings shall be published in accordance with KRS Chapter 424.

(2) The hearings held pursuant to this section shall provide an opportunity to be heard to all persons residing or owning property in the area described in the notice of the public hearing, and to all residents of the city.

(3) At each public hearing, a representative of the city shall make an explanation of the report required in Section 12 of this Act. Such explanation shall be as detailed as necessary so as to convey an accurate and definitive report.

(4) The board of aldermen shall take into consideration facts presented at the public hearings and shall have authority to amend the report required by Section 12 of this Act and to make changes in the plans for serving the area proposed to be annexed. If any amendment or change is approved by the board, another hearing shall be held to provide any person residing or owning property in the area to be annexed or any resident of the city an opportunity to be heard on the amendment or amendments. Such hearing shall be held not later than thirty (30) days after the board approves the amendment. Notice of such hearing shall be published in accordance with KRS Chapter 424.

SECTION 14. A NEW SECTION OF KRS CHAPTER 81 IS CREATED TO READ AS FOLLOWS:

**81A.070** (1) A city of the first class shall tax property within the annexed area only in such amount as is commensurate with city services or facilities actually made available to the residents or property of the affected area including continuation of services provided prior to annexation.

(2) If services available from the city have been provided prior to annexation from another source in the annexed area, the city shall not tax for such services unless they are actually provided by the city as a lawful replacement for existing services.

Section 15. The following sections of the KRS are repealed:

*81.140* Annexation of unincorporated territory or reduction of territory by second–class city.

*81.145* Election on annexation of unincorporated territory by a city of the second class in a county containing a city of the second and third class.

*81.150* Annexation of fifth or sixth–class city by second–class city.

*81.160* Annexation of second, third or fourth–class city by second–class city.

*81.170* Second–class city takes over rights and liabilities of territory annexed.

*81.180* Second–class city to divide annexed territory into wards–Right of electors in annexed territory.

*81.190* Annexation or reduction of territory by third–class city.

*81.200* Third–class city takes over rights and obligations of city annexed.

*81.210* Annexation or reduction of territory by fourth–class city.

*81.220* Protest against annexation by fourth–class city–Trial–Judgment.

*81.230* Annexation or reduction of territory by fifth–class city.

*81.235* Acquisition of lands by city of fifth class for relocation–When–Expenditures for such purpose.

*81.240* Annexation or reduction of territory by sixth–class city.

*81.250* Fifth or sixth–class city takes over rights and liabilities of city annexed.

*81.260* Liability of property owners in territory annexed to sixth–class city for debts of city incurred before annexation.

81.270 Resubmission of proposal for annexation or reduction by city of any class when first proposal is denied by court or defeated by voters.

81.290 Copy of ordinance proposing annexation or reduction of territory by city in county containing a city of first class to be forwarded to fiscal court– Protest suit, fiscal court to be made a party.

81.296 Publication of ordinance.

Section 16. There shall be established a local government annexation statute revision commission to study and review the laws pertaining to annexation and reduction of territory by cities and counties. The commission shall work toward preparing a report and proposed legislation for the 1982 general assembly which will effect a comprehensive revision of annexation laws in Kentucky.

Section 17. (1) The commission shall be composed of nine (9) members appointed by the legislative research commission as follows:

(a) Three (3) members of of the house of representatives of the Kentucky general assembly;

(b) Three (3) members of the senate of the Kentucky general assembly;

(c) One (1) representative of the Kentucky municipal league;

(d) One (1) mayor of a city; and

(e) One (1) county judge/executive of a county.

(2) The members shall serve for a period of two (2) years. Vacancies in the commission shall be filled by appointment in the same manner as the original appointment. The members shall elect a chairman from among themselves.

(3) The members shall serve without pay, but the non–legislative members shall receive their reasonable and necessary expenses in connection with the performance of their duties.