[L.A. No. 31414. Dec. 2, 1982.]

CITIZENS AGAINST FORCED ANNEXATION et al.,
Plaintiffs and Respondents, v.
LOCAL AGENCY FORMATION COMMISSION OF
LOS ANGELES COUNTY et al., Defendants and Appellants.

COUNSEL

John H. Larson, County Counsel, and Charles J. Moore, Deputy County Counsel, for Defendants and Appellants.

Ira Reiner, City Attorney (Los Angeles), Gary R. Netzer, Assistant City Attorney, and William L. Waterhouse, Deputy City Attorney, as Amici Curiae on behalf of Defendants and Appellants.

Brown, Winfield & Canzoneri, Thomas F. Winfield III and David J. Aleshire for Plaintiffs and Respondents.

Steven R. Meyers, City Attorney (San Leandro), and Elizabeth H. Silver, Assistant City Attorney, as Amici Curiae on behalf of Plaintiffs and Respondents.

## OPINION

**BROUSSARD, J.**—Pursuant to the Municipal Organization Act of 1977 (Gov. Code, § 35000 et seq.) (Act), defendant Local Agency Formation Commission of Los Angeles County (LAFCO) adopted a resolution in favor of a proposal to annex the unincorporated territory of Eastview to the City of Rancho Palos Verdes (City). Under Government Code, sections 35228 and 35231,[1] LAFCO's resolution required the City to call a special election at which only the residents of Eastview could vote whether to approve or disapprove the annexation. The residents voted in favor of annexation.

Plaintiffs, residents of the City, maintain that the Act, by limiting the franchise to residents of the territory to be annexed, denies residents of the annexing city the equal protection of the laws. At plaintiffs' request, the superior court issued a preliminary injunction barring defendants, LAFCO and its executive officers, from executing and recording a certificate of completion, a

---

[1]Unless otherwise indicated, all statutory citations are to the Government Code.

document certifying the results of an annexation election. (See § 35351.)[2] Defendants appeal from the preliminary injunction. (See Code Civ. Proc., § 904.1, subd. (f).)

This appeal presents a single issue, but one of first impression: does a statute which limits the franchise in an annexation election to residents of the territory to be annexed violate the state or federal Constitutions? As we explained in *Fullerton Joint Union High School Dist.* v. *State Bd. of Education* (1982) *ante,* page 779 [187 Cal.Rptr. 398, 654 P.2d 168] (hereafter *Fullerton*), any restriction on the franchise within the constitutionally relevant geographic area is invalid unless necessary to further a compelling state interest. In an annexation election, the relevant geographic area encompasses both the region to be annexed and the annexing city.

We must therefore scrutinize the statutory plan to determine if it can be sustained as necessary to serve a compelling state interest. We recognize the state's concern, evidenced by the provisions of the 1977 Act, to provide an efficient and economical means for residents of unincorporated areas to join a neighboring city and thereby obtain the advantages of municipal services and government. In some cases, we observe, it is in the interest of the state to facilitate such annexations even if the majority of residents of the annexing city are opposed, since otherwise problem areas with a low tax base or a high cost of providing services might be unable to gain admission to any adjoining municipality. We conclude that the state's interest in this regard is of compelling character, and is plainly one which could not be achieved if the annexation election was open to the residents of the annexing city. Accordingly we sustain the constitutionality of the challenged statutes.

### 1. *The Municipal Organization Act of 1977*

The 1977 Act completely revised the statutory procedures for the organization of municipal government and the annexation of unincorporated territories. Repealing provisions which permitted the legislative body of the annexing city to reject a proposed annexation (see former §§ 35007, 35121.5, 35122, 35135), it vests primary power to review annexation proposals in the county Local Agency Formation Commission (see § 35150), subject in some cases to the right of registered voters to reject a proposal.

The Act sets out an extensive definition of terms. (§§ 35020-35051.) The term "affected territory" in the Act refers to the area proposed for annexation (§ 35024); "affected city" to the city which would annex that territory

---

[2]The City is not a party to this action.

(§ 35021). "Commission" means the Local Agency Formation Commission with jurisdiction over the region in question. (§ 35030.) "Conducting authority" refers to the legislative body of the "affected city." (§ 35031.) For convenience in this opinion, we shall employ the statutory terminology.

We summarize the Act's provisions relating to annexations of inhabited territory, a term which refers to territory with 12 or more registered voters. (§ 35038.) Upon receipt of a petition signed by 5 percent of the registered voters, or 5 percent of the number of landowners who also own 5 percent of the assessed value of land, the commission must determine the sufficiency of the petition and, finding it sufficient, set the matter for hearing. (§§ 35133, 35152.) Following a hearing, and preparation of an environmental study if required (see § 35152), the commission must adopt a resolution approving or disapproving the proposal. (§ 35157.) If it approves the proposal, the conducting authority—the legislative body of the annexing city (§ 35031)—*must* initiate annexation proceedings. (§ 35161.)

After adopting the compulsory resolution initiating annexation proceedings, the conducting authority sets a date for a hearing and receipt of protests from registered voters or landowners within the area to be annexed. (§ 35220.) Sections 35228 and 35231 specify the duty of the city following that hearing. Section 35228 states that: "When the territory proposed to be annexed or detached is inhabited, the conducting authority, not more than 30 days after conclusion of the hearing, shall adopt a resolution making a finding regarding the value of written protests filed and not withdrawn and taking one of the following actions: [¶] (a) Terminate proceedings if written protests have been filed and not withdrawn by 50 percent or more of the registered voters within the affected territory. [¶] (b) Order the territory annexed or detached subject to the confirmation by the voters on the question, and *call a special election and submit to the voters residing within the affected territory the question of whether it shall be annexed to* or detached from *the city,* if written protests have been filed and not withdrawn by either 25 percent or more of the registered voters within the territory, or 25 percent or more of the owners of land, who also own not less than 25 percent of the total assessed value of land within the territory. [¶] (c) Order the territory annexed or detached without an election if written protests have been filed and not withdrawn by less than 25 percent of the registered voters within the territory and less than 25 percent of the owners of land who own less than 25 percent of the total assessed value of land within the territory." (Italics added.)[3]

---

[3]When annexation involves a detachment from a special district, it is governed by the District Reorganization Act of 1965. (§ 56000 et seq.) This act, as amended, contains provisions for a franchise limited to residents of the territory to be annexed (see §§ 56252.1, 56438, 56440) essentially the same as those at issue in the present case.

Section 35228 makes no mention of an election within the affected city. Section 35231, however, provides that: "*Any resolution* adopted pursuant to subdivision (b) of Section 35228 ordering annexation or detachment of territory subject to the confirmation by the voters *shall also call an election in the affected city* and submit to the registered voters residing therein the same question at the same time as that submitted to the registered voters residing within the affected territory *if*: [¶] (a) *The total assessed value of land within the affected territory equals one half or more of the total assessed value of land within the affected city* as shown on the last equalized assessment roll; *or* [¶] (b) *The number of registered voters residing within the affected territory equals one-half or more of the number of registered voters residing within the affected city* as shown on the county register of voters." (Italics added.)

If the voters approve the annexation, the conducting authority notifies the commission. (§ 35350.) The executive officer of the commission then executes (§ 35351) and records (§ 35352) a certificate of completion. Unless otherwise specified in the annexing resolution, the annexation becomes effective on the recording of the certificate of completion. (§ 35354.)

*2. Proceedings to annex Eastview to the City.*

The City, ironically itself the product of litigation (see *Curtis* v. *Board of Supervisors* (1972) 7 Cal.3d 942 [104 Cal.Rptr. 297, 501 P.2d 537]), is a low density residential community on the Pacific Ocean in Los Angeles County. It has an area of about 12.3 square miles and a population of about 40,000. The unincorporated territory of Eastview adjoins the City to the east; it has an area of 840 acres and a population of 9,055 persons. Although also primarily a single family residential community, it is much more densely populated than the City. The addition of Eastview to the City would increase the number of registered voters in the City by about 20 percent and the assessed value of land by a lesser percentage—figures which are insufficient under section 35231 to require a vote by residents of the affected city.

In November of 1978, a group of Eastview residents submitted an annexation petition to LAFCO. LAFCO undertook an environmental study and, finding no significant environmental impact, filed a negative declaration. Following a series of hearings, and after excluding a portion of Eastview from the annexation, LAFCO approved the proposal and directed the City to initiate annexation proceedings.

On June 28, 1979, plaintiffs, a coalition of residents and homeowners associations in the City, filed suit against LAFCO and its executive officers. The suit sought a declaration that the provisions of the 1977 Act concerning an-

nexations of inhabited territory were unconstitutional and an injunction restraining defendants from executing a certificate of completion.

The following day the City, as required by section 35228, conducted a hearing to receive protests to the proposed annexation. Sufficient protests were filed to require the City to call an election limited to residents of the affected territory. In the ensuing election, the majority of voters approved the proposal.

On January 16, 1980, the superior court issued its injunction barring LAFCO and its executive officer from executing or recording a certificate of completion. Defendants appealed.

3. *Standard for review of the constitutional challenge to the Act.*

In reviewing restrictions on the franchise, this court and the United States Supreme Court have applied a two-level test: ordinarily legislation is valid if it bears a rational relationship to a conceivable legitimate state purpose, but distinctions involving suspect classifications or touching upon fundamental rights require closer examination, and are valid only if the state proves that the distinctions are necessary to serve a compelling state interest. (*Fullerton, ante,* pp. 779, 798-799; *Curtis* v. *Board of Supervisors, supra,* 7 Cal.3d 942, 951-952.) *Curtis* itself held that a statute which limited voting rights in connection with the incorporation of a city touched upon fundamental rights, and thus was subject to strict judicial scrutiny; *Levinsohn* v. *City of San Rafael* (1974) 40 Cal.App.3d 656 [115 Cal.Rptr. 309] applied the same doctrine to annexation elections.

As we explain in *Fullerton, ante,* pages 779, 805, this constitutional test requires us to "determine the constitutionally relevant boundaries, 'the geographic boundaries of the governmental entity concerned' (*Holt Civic Club* v. *Tuscaloosa* [1978] 439 U.S. [60] at p. 68 [58 L.Ed.2d 292, 300, 99 S.Ct. 383]), and subject to strict scrutiny any measure which limits voting within those boundaries." This requirement, however, raises a difficult problem in cases involving annexation or deannexation, for in such cases one can plausibly argue either that the relevant entity is limited to the smaller territory whose legal status will be altered by a successful vote (the affected territory), or that it includes the larger entity (the affected city) whose territory may be augmented or diminished.

Academic analysis suggests that the relevant area includes both the affected territory and the affected city. "[W]hile geographic restrictions on voting in local elections are justifiable as a general matter, limiting the franchise in annexation elections to voters in either the annexing or the annexed area may not

be similarly acceptable. . . . Annexing and annexed citizens clearly share general concerns with the governance and welfare of the area. . . . When a state has chosen to enfranchise only one of the areas affected by the annexation, it must justify the disfranchisement of the other area by a showing that it promotes some significant state interest." (Note, *The Right to Vote in Municipal Annexations* (1975) 88 Harv.L.Rev. 1571, 1578-1581; see, Note, *Annexation Elections and the Right to Vote* (1973) 29 UCLA L.Rev. 1093, 1113-1114.)

We confronted a similar problem in *Fullerton,* in which we considered a proposed secession of the community of Yorba Linda from the Fullerton Joint Union High School District. We held that the entire Fullerton district, not just Yorba Linda, was the relevant geographical area for application of a standard of strict scrutiny. We noted that the Fullerton district "is not merely a neighboring district incidentally affected by the secession of Yorba Linda, but the existing entity with legal authority over high school education in Yorba Linda; the impact of the secession is in large part the consequence of the present status and authority of the Fullerton district." (*Ante,* p. 803.) The withdrawal of Yorba Linda, we observed, might cause the remaining district to incur a substantial debt, leave it with excess educational capacity, and affect its education programs.[4]

In like fashion, the annexation of Eastview at issue in the present case affects not only its residents, but also the present residents of the City. That impact is not merely the effect of geographic propinquity, but the effect of the establishment of a legal relationship. The residents of the affected territory will be entitled to vote in City elections and participate in City government. The City will acquire a right to assess taxes and to enforce its ordinances and regulations in

---

[4]We summarize briefly the other cases cited by the parties which bear on the present litigation.

*Adams* v. *City of Colorado Springs* (D.Colo. 1970) 308 F.Supp. 1397, affirmed (1970) 399 U.S. 901 [26 L.Ed.2d 555, 90 S.Ct. 2197], concerned a statute which permitted a city to annex unincorporated territory by city council resolution if over two-thirds of the perimeter of the annexed territory was contiguous to the city. The court applied the rational relationship test to uphold the statute.

*Murphy* v. *Kansas City, Missouri* (W.D.Mo. 1972) 347 F.Supp. 837, upheld a provision of the Missouri Constitution which permitted a city to annex unincorporated territory by amending its charter, an action which required approval of only city voters.

*Moorman* v. *Wood* (E.D.Ky. 1980) 504 F.Supp. 467 involved a statute which provided that if a portion of a city seeks to leave that city and join a neighboring municipality, the issue is submitted to a vote of residents of only the affected territory (excluding other residents in both the annexing city and the source city). Reviewing the divisive controversy which led to adoption of this statute, the court upheld it on both the rational relationship and compelling state interest tests.

Each of the cited cases upheld the challenged enactment. *Moorman,* however, was the only case involving an annexation which limited the franchise to residents of the area to be annexed, and in that decision the federal district court, carefully covering all bases, upheld the statute under both the rational relationship and the strict scrutiny tests.

the affected territory; it incurs also a duty to extend police protection and other municipal services to that territory. Thus, the establishment of the legal relationship contemplated in this case, like the dissolution of a legal relationship involved in *Fullerton,* has a substantial effect upon the residents of both territories involved. We therefore conclude that the relevant geographic confines, for the purpose of constitutional analysis, includes both the affected territory and the affected city. We must therefore inquire whether the restrictions on the franchise imposed by sections 35228 and 35231 serve a compelling state interest and are necessary to further that purpose.

4. *The restricted franchise imposed by sections 35228 and 35231 is necessary to serve a compelling state interest.*

Our inquiry into the state interests underlying the restrictive franchise in annexation elections differs from the inquiry we undertook in *Fullerton.* In that case, the issue before us concerned the discretionary decision of the State Board of Education to limit the franchise to residents of the seceding portion of the school district; we therefore inquired specifically whether denying the vote to the residents of the remaining portion of this school district was necessary to serve a compelling state interest. In the present case, the controlling statutes, sections 35228 and 35231, grant no discretionary authority to LAFCO, but establish a formula to determine when residents of the affected city may vote on an annexation proposal. Our inquiry is therefore a general one, not limited to this particular annexation proposal: whether the statutory restrictions on the franchise in annexation elections are necessary to serve a compelling state interest.

██ LAFCO, supported by the City of Los Angeles as amicus curiae, advances three state interests served by limiting the vote to residents of the affected territory: (1) avoiding the cost and administrative burden of extending the vote to residents of the affected city; (2) avoiding the danger that the votes of the persons most concerned with the annexation issue, the residents of the affected territory, will be overwhelmed by a much larger number of votes from the less interested city residents; (3) avoiding the risk that unincorporated areas might be unable to obtain the benefits of municipal government and services if annexation was unattractive to residents of neighboring cities. We review each of the asserted interests, explaining that each may qualify as a compelling interest under the constitutional test. However, the validity of the statutory scheme—because it denies any voice to city residents either directly or through their elected officials—must rest on the last asserted interest, the only one which could justify compelling cities to annex adjoining territory even if the city's residents oppose annexation.

We first consider together the asserted state interest in avoiding the cost and burden of an election encompassing the affected city and its asserted interest in limiting the vote to persons with a substantial interest in the annexation. An example suggested by amicus the City of Los Angeles will illustrate both assertions. Suppose LAFCO had recommended annexation of Eastview not to Rancho Palos Verdes, but to the City of Los Angeles. Such an annexation would have no discernible impact upon most of the 3 million residents of Los Angeles, but a substantial impact upon the 9,055 residents of Eastview. To require a city-wide election in Los Angeles to approve the annexation would impose a cost and administrative burden far exceeding that entailed by an election limited to Eastview, and in such an election the votes of Eastview would be lost amid the million or more votes of city residents who have little or nothing at stake.

We recognize that the state's interest in limiting expenditures and administrative burdens is generally not of compelling character (see *Gould* v. *Grubb* (1975) 14 Cal.3d 661, 675 [122 Cal.Rptr. 377, 536 P.2d 1337] and cases there cited); commentators have questioned whether such an interest alone can ever justify limiting the franchise in an annexation election (see Note, *op. cit. supra,* 88 Harv.L.Rev. 1571, 1581; Note, *op. cit. supra,* 20 UCLA L.Rev. 1093, 1119-1120). Courts, however, have looked more favorably on the argument that the state may have a compelling reason to limit the franchise to voters specially interested in the matter at issue. In *Lockport* v. *Citizens for Community Action* (1977) 430 U.S. 259 [51 L.Ed.2d 313, 97 S.Ct. 1047], the court noted that in a "single shot" or "referendum" election, the state may more easily justify limiting the franchise because the single proposal makes it far easier "to determine whether its adoption or rejection will have a disproportionate impact on an identifiable group of voters." (P. 266 [51 L.Ed.2d, p. 321].) Our opinion in *Fullerton* observed that although it is "clear that the state cannot claim a compelling interest in excluding voters because of how they may vote. . . . [i]f we rephrase the justification . . . as one of excluding uninterested voters in order to protect the interests of persons vitally concerned, we encounter a state interest which might, in an appropriate case, achieve compelling character." (*Ante,* pp. 779, 805.)

The example cited earlier demonstrates convincingly that in some cases a city-wide election to approve an annexation is absurd, imposing an inordinate burden and expense, and having the effect of nullifying the votes of those persons affected by the issue under a mass of ballots from persons uninterested in the issue. Thus in some cases—specifically, cases involving the annexation of a territory with relatively few residents to a much larger municipality—the statutory limitation on voting may serve a compelling state interest. As plaintiffs point out, however, in other cases, when the population of the affected ter-

ritory and the annexing city are more nearly equal, the state cannot claim an equally compelling interest in limiting the franchise; annexation in such cases may have a significant effect on city residents as well as upon residents of the affected territory.

Thus, the constitutional problem becomes a matter of distinguishing those cases in which a franchise limited to residents of the affected territory is justified from those in which it is not. The Legislature has recognized that distinction, and provided in section 35231 that, once the requisite number of protests have been filed to require an election,[5] the conducting authority "shall also call an election in the affected city and submit to the registered voters residing therein [the question of annexation] . . . if: [¶] (a) The total assessed value of land within the affected territory equals one-half or more of the total assessed value of land within the affected city . . . or [¶] (b) The number of registered voters residing within the affected territory equals one-half or more of the number of registered voters residing within the affected city . . . ."

The Legislature has thus undertaken to measure the relative interests of residents of the affected territory and the city, and the expense and burden of an election encompassing both groups. It has concluded that if the assessed value of land in the affected territory does not equal 50 percent or more of the city's assessed value, and the number of registered voters is not equal to 50 percent of the city's list, the impact of annexation on the city's treasury or voting rolls is insufficient to require an election in the city.

We find no basis to question the line drawn by the Legislature. To be sure, any quantitative measure is in a sense arbitrary; we cannot say that a compelling interest required drawing a line at the case in which the territory has voters equal to 50 percent of the city's number instead of 40 percent or 25 percent. But once we find that the Legislature has a compelling interest in drawing a distinction between annexations in which the city residents should vote, and those in which they should not, we cannot deny it the right to act merely because line-drawing is necessarily imprecise.

In this respect, the present case resembles *Weber* v. *City Council* (1973) 9 Cal.3d 950 [109 Cal.Rptr. 553, 513 P.2d 601], which involved a statute that

---

[5]Under section 35228, there is no election at all unless written protests are filed by 25 percent of the registered voters *in the affected territory,* or 25 percent of landowners owning not less than 25 percent of the assessed value of land *in that territory.* Since the required protests were filed against the Eastview annexation, we need not consider plaintiffs' contention that it is unconstitutional to condition the right of city residents to vote upon the filing of protests by residents and landowners in the affected territory.

permitted a city to annex "uninhabited territory" without an election, and which defined "uninhabited territory" as territory with less than 12 registered voters. Reasoning that the state could legitimately avoid annexation elections in sparsely inhabited territory (see 9 Cal.3d at pp. 964-965), we upheld the statute without concern for the arguably arbitrary selection of 12 registered voters as the crucial number.

We conclude that the state can show a compelling interest in limiting the vote to residents of the affected territory when the number of voters in that territory is substantially less than the number in the affected city. We conclude also that the standard established in section 35231 provides an acceptable line to distinguish those cases in which an election should be so limited. Proof of such a compelling interest, however, may not be sufficient in itself to sustain the statutory classification. As the Supreme Court stated in *Dunn* v. *Blumstein* (1972) 405 U.S. 330, 343 [31 L.Ed.2d 274, 285, 92 S.Ct. 995]: "It is not sufficient for the State to show that [the statutory] requirements further a very substantial state interest. In pursuing that important interest, the State cannot choose means that unnecessarily burden or restrict constitutionally protected activity."

Before enactment of the 1977 Act, the California statutes required concurrent approval of an annexation by residents of the affected territory in a special election called for that purpose and by the legislative body of the annexing city. (See former § 35122.) Although city residents did not vote in the special election, they were not wholly denied the right to vote with regard to the annexation issue since any annexation had to be approved by their elected representatives.[6] Thus, under the former statutory scheme, the asserted state interests in avoiding the cost and burden of a city-wide election and the effect of aggregating territorial and city votes were achieved in a manner less restrictive of the political rights of city residents. Consequently, to sustain the provisions of the 1977 Act, the state must show a compelling interest in denying cities' residents a right to vote on annexation either directly or through their elected representatives.

We therefore turn to the third interest advanced in defense of the franchise restrictions. LAFCO asserts that the state has a compelling interest in permitting unincorporated territories to elect to join adjacent cities, obtaining the benefits of municipal government and services, even if the city's residents oppose annexation.

---

[6] "[W]hen the annexing area's governing board decides to annex, its voters should be seen as participating in the action through their election of the board's members." (Note, *op. cit. supra*, 88 Harv.L.Rev. 1571, 1599.)

The history and structure of the California statutes relating to annexation support the asserted state interest. Prior to the establishment of local agency formation commissions in 1963, annexation controversies took on the appearance of "a kind of warfare in which the unincorporated suburbs of the state have been both the prize and battleground, the annexation process a tactic, the location of annexation boundaries a significant weapon, and their calculated manipulation a commonplace event." (*Tillie Lewis Foods, Inc.* v. *City of Pittsburg* (1975) 52 Cal.App.3d 983, 995 [124 Cal.Rptr. 698].) Then, "[a]fter years of failure to cope with these problems to any meaningful extent . . ., the Legislature finally acknowledged 'the need for a supra-local agency to intervene in boundary decisions' affecting local governments and, in 1963, established a LAFCO in each county to serve this purpose." (*Ibid.*) The Knox-Nisbet Act of 1965 charged the commissions with the duty of encouraging "the orderly formation and development of local governmental agencies based upon local conditions and circumstances" (§ 54774); it then granted the commissions broad authority to approve, modify, or disapprove annexation proposals in accord with specified standards (§§ 54790, 54796; see *Bozung* v. *Local Agency Formation Com.* (1975) 13 Cal.3d 263, 274 [118 Cal.Rptr. 249, 529 P.2d 1017]; *Tillie Lewis Foods, Inc.* v. *City of Pittsburg, supra*, 52 Cal.App.3d 983, 1002).

Neither the 1963 legislation creating the commissions nor the 1965 legislation extending their authority repealed the Annexation Act of 1913 (Stats. 1913, ch. 312), which remained the principal substantive authority under which inhabited territory could be annexed. The tension between that earlier act, which vested primary power in the residents and property owners of the affected territory and the government of the annexing city, and the later acts granting discretion to the commissions, continued until the enactment of the 1977 Act. The preface to the 1977 law which led to its enactment reiterates the state's interest in encouraging orderly growth and development and in favor of logical determination of city boundaries (§ 35000). It then explicitly finds that "urban population densities . . . necessitate a broad spectrum and high level of community services and controls," which can be best provided by a "single governmental agency, rather than several limited purpose agencies." (*Id.*) The Act thus states a legislative goal of providing a full range of municipal services to developing areas beyond present city boundaries and, by implication, the belief of the Legislature that such services can be provided more efficiently by municipal government, through annexation, than by the special districts and agencies which more commonly serve unincorporated lands.

The 1977 Act then repeals the 1913 act and comprehensively revises the statutory procedures governing incorporation, civic reorganization, annexation, and detachment of territory. It confirms the authority of the commissions

to control annexation (see § 35150), and the right of residents of inhabited territories to self-determination (see § 35228), but eliminates the power of city governments to reject an annexation. Thus, under the 1977 Act, if the residents of an affected area desire to join a neighboring city, and that proposal accords with the pattern of orderly community development as envisioned by the commission, the city and its voters no longer have the power to defeat annexation.

The foregoing history indicates that the Legislature had determined that the goals of promoting orderly and logical community development, and of providing municipal services to newly urbanized regions, cannot adequately be met if city governments and their voters have a veto power over annexations approved by local agency formation commissions. The inconsistency between the legislative objectives and a municipal veto is especially acute in a case, such as the present Eastview annexation, in which the unincorporated territory contains primarily less expensive housing units and, lacking substantial commercial or industrial development, does not possess the tax base needed to incorporate as a new municipality. In such a case, the commission may conclude that the logical step in orderly community development would be to permit the area to join a neighboring city. From the viewpoint of city residents, however, such annexation is an unattractive prospect since the cost of providing services to the affected area might exceed the tax revenues it would produce. Thus, if city voters or their elected representatives have the final decision on annexation, the result might be to leave "orphan" islands of unincorporated territory rejected by all neighboring cities but lacking the financial resources for self-incorporation.

We conclude that the state's interest in carrying out a policy of planned, orderly community development under the guidance of the local agency formation commissions, and in particular its interest in avoiding the creation or perpetuation of islands of unwanted, unincorporated territories, is of compelling importance. That interest cannot be achieved if residents of the affected city or their elected representatives have the power to reject an annexation endorsed by the commission and approved by the residents of the affected territory. Thus, the restrictions upon the franchise imposed by the 1977 Act are necessary to the accomplishment of this compelling objective. We therefore hold that the restrictions imposed by sections 35228 and 35231 survive the strict scrutiny applicable to provisions which limit fundamental rights, and do not abridge rights guaranteed under the state or federal Constitutions.

The order is reversed, and the matter remanded to the superior court with directions to enter an order denying the request for a preliminary injunction.

Bird, C. J., Mosk, J., and Reynoso, J., concurred.

KAUS, J.—For the reasons discussed in my concurring and dissenting opinion in *Fullerton Joint Union High School Dist.* v. *State Bd. of Education* (1982) *ante,* at page 779 [187 Cal.Rptr. 398, 654 P.2d 168], I concur in the judgment.

Richardson, J., and Newman, J., concurred.