[No. B069545. Second Dist., Div. Two. Apr. 12, 1993.]

GREENWOOD ADDITION HOMEOWNERS ASSOCIATION et al.,
Plaintiffs and Respondents, v.
CITY OF SAN MARINO et al., Defendants and Appellants.

**COUNSEL**

De Witt W. Clinton, County Counsel, Lloyd W. Pellman, Assistant County Counsel, and Richard D. Weiss, Deputy County Counsel, Steven L. Dorsey,

City Attorney, Richards, Watson & Gershon and Rochelle Brown for Defendants and Appellants.

Burke, Williams & Sorensen and Robert V. Wadden, Jr., as Amici Curiae on behalf of Defendants and Appellants.

DiJulio & King and R. David DiJulio for Plaintiffs and Respondents.

## OPINION

**FUKUTO, J.**—When an application to annex unincorporated territory to a city has been filed with a local agency formation commission (LAFCO), is the city obligated to agree with the county to an exchange of property tax revenues? If the city does not so agree, must the LAFCO nonetheless proceed to hear and determine the annexation application? In this case the trial court answered both of these questions affirmatively, and granted a writ of mandate requiring defendants City of San Marino and Los Angeles County LAFCO (hereafter L.A. LAFCO) so to proceed. In so ruling, the court substituted its perception of public policy for manifest legislative restrictions, which command a negative answer to the two questions posed. The judgment accordingly must be reversed.

### THE PROCEEDINGS

Under the Cortese-Knox Local Government Reorganization Act of 1985 (Gov. Code, §§ 56000-57550, hereafter Cortese-Knox Act),[1] the LAFCO for each county reviews and approves or disapproves proposed local government changes of organization, including annexations of territory. (§§ 56017, 56021, 56375).[2] Annexation proceedings may be initiated by the annexing city's resolution, or, depending on the locale, by petition of 15 or 25 percent of the registered voters, or property taxpayers owning that percentage of assessed valuation, in the territory proposed to be annexed. (§§ 56650, 56753, 56800.) If, after a hearing, the LAFCO disapproves the application, that decision is final. (§§ 56851, 56855.) If the LAFCO approves the proposal, the city must accept and implement it, unless 50 percent or more of the voters in the area to be annexed terminate the proceedings by filing

---

[1]With one exception, undesignated section references are to the Government Code. The exception is Revenue and Taxation Code section 99, which is also cited in this fashion as "section 99."

[2]L.A. LAFCO consists of seven members: two county supervisors; one nonsupervisor appointed by the board of supervisors from the San Fernando Valley as delineated in section 11093; two city officers chosen by a city selection committee; one city legislator from a city with more than 30 percent of the county's population; and one representative of the general public, appointed by the other six. (§ 56326.)

written protests, or unless 15 or 25 percent of the voters, depending on the locale, file protests, in which event the issue is resolved by an election, in which only voters in the territory approved for annexation may vote. (§§ 57075, 57075.5, 57078, 57103, 57176.)

In June 1990 plaintiffs, Greenwood Addition Homeowners Association, its president, and two other members, filed with L.A. LAFCO an application to annex their neighborhood (hereafter Greenwood), an unincorporated sector of Los Angeles County, to the adjacent City of San Marino. Greenwood, a 240-acre "island" of territory between Pasadena on the north and San Marino on the south, contains approximately 800 single-family homes, apartments or condominiums, housing 1,650 residents, as well as a few commercial properties. Plaintiffs' application included a petition signed by nearly 25 percent of Greenwood's registered voters. The application stated as reasons for the proposed annexation the obtaining of superior police, fire and other municipal services, and noted that the annexation would allow conversion from use of septic tanks and cesspools to a sewer system. L.A. LAFCO had previously assigned Greenwood to San Marino's "sphere of influence" (§§ 56076, 56425), rendering annexation to Pasadena presently impossible (§ 56650.5).

Plaintiffs' filing triggered operation of the two statutes at issue in this appeal, section 56828 and Revenue and Taxation Code section 99. Under section 56828, subdivisions (d)-(g) and (i), L.A. LAFCO was required to set the application for hearing after issuing a "certificate of filing," which would occur immediately after the application was accepted for filing, either expressly or, if not found incomplete within 30 days, by operation of law. Simultaneously, section 99, subdivision (b)(1)-(4) required the county assessor and auditor to compile and notify San Marino and the county of the estimated property tax revenue attributable to Greenwood, whereupon San Marino and the county were required to commence negotiations, for no more than 30 days, to determine the revenues to be exchanged if the application were approved. In addition, subdivision (b)(6) of section 99 provides that "Notwithstanding any other provision of law, the [LAFCO] shall not issue a certificate of filing pursuant to Section 56828 of the Government Code until the local agencies included in the property tax revenue exchange negotiation, within the 30-day negotiation period, present resolutions adopted by each such county and city whereby each county and city agrees to accept the exchange of property tax revenues."

Plaintiffs filed their application on June 11, 1990. Aware it was impending, L.A. LAFCO's executive assistant had already asked the county auditor

to compile the tax revenue information. L.A. LAFCO received it on June 13, 1990, and mailed it the next day to San Marino's city manager and a county representative, who met on June 19 to commence negotiations. Their discussion also concerned two other annexation applications pending for San Marino, one of them involving a neighborhood near Greenwood.

At this negotiation, the county offered to transfer an equal proportion, less than the whole, of the property tax revenues for each area, and stated it was not its practice to exchange more. After some discussion of the costs of local services, San Marino's representatives requested, and the county agreed, to adjourn until September, to permit further investigation of those costs.

The negotiations never resumed. San Marino's city manager obtained estimates of the Greenwood-related service costs, which exceeded the total estimated property tax revenue of Greenwood. After several city council meetings in which numerous residents expressed hostility to the annexation proposals as impairing the quality and integrity of the city, the city manager on February 7, 1991, reported to the council the expected revenue shortfall, as well as widespread opposition to the annexation in a local public opinion survey. The council then unanimously resolved to take no further action on the Greenwood annexation proposal, and directed the city manager to report this to L.A. LAFCO. The city manager's responsive letter stated that "the San Marino City Council [had] acted to terminate tax transfer negotiations with Los Angeles County in connection with petitions for . . . Annexation Area #3 (Greenwood)," because of insufficient service revenue expectations "and other considerations." LAFCO in turn notified the county and plaintiffs that the Greenwood application would not be set for hearing, because of the failure to meet the requirements of section 99, subdivision (b)(6).

More than a year later, plaintiffs commenced this proceeding, against San Marino, its individual city council members, and L.A. LAFCO. Plaintiffs alleged their application had been legally accepted by L.A. LAFCO under section 56828, and that L.A. LAFCO therefore had a ministerial duty to issue a certificate of filing and set the application for hearing. Further, under section 99, subdivision (b)(4), San Marino had been under a ministerial duty to negotiate "and determine" the exchange of property tax revenues within 30 days, which it had defied. In a second cause of action, plaintiffs alternatively alleged that these failures to act, if discretionary, were arbitrary and capricious. Plaintiffs prayed for a writ of mandate requiring San Marino to

negotiate and adopt a tax exchange with the county, and requiring L.A. LAFCO to set the Greenwood application for hearing.[3]

The court granted the petition for writ of mandate, and entered a separate judgment, severing it from plaintiffs' damage claims.[4] In ruling, the court stated it was heavily influenced by a "public policy" of not affording affected cities "veto power" over annexation proposals. The court perceived this policy to have been expressed in *Citizens Against Forced Annexation* v. *Local Agency Formation Com.* (1982) 32 Cal.3d 816, 829 [187 Cal.Rptr. 423, 654 P.2d 193] (hereafter *Citizens Against Forced Annexation*), subsequently disapproved in part in *Board of Supervisors* v. *Local Agency Formation Com.* (1992) 3 Cal.4th 903 [13 Cal.Rptr.2d 245, 838 P.2d 1198] (hereafter *Board of Supervisors*).[5]

The judgment, as well as the court's order granting the petition, directed a writ requiring San Marino and L.A. LAFCO to recommence the annexation process. Upon receiving current property tax revenue estimates from the county auditor, San Marino was to recommence negotiations with the county, "in good faith," and within 30 days was to adopt a resolution agreeing to an exchange of property tax revenues for Greenwood. L.A. LAFCO then was to issue a certificate of filing and set plaintiffs' application for hearing, whether or not L.A. LAFCO had received such a resolution (and apparently whether or not one had been adopted).

The judgment and order also included certain legal declarations, not expressly sought by the pleadings, interpreting sections 56828 and 99 to the effect that (1) the prohibition against issuing a certificate of filing contained in section 99, subdivision (b)(6) operates only during the statutory 30-day negotiating period; and (2) that that period is not exclusive, so that the "duty to negotiate" continues until a tax exchange resolution is adopted, and such a resolution is valid even if adopted beyond the 30-day period.

---

[3]Plaintiffs further alleged, against all defendants, purported causes of action for inverse condemnation, violation of civil rights of just compensation, and intentional infliction of emotional distress (as well as negligent infliction of emotional distress, against San Marino). Demurrers to these causes of action were sustained, and the briefs state they were dismissed during the pendency of this appeal.

[4]The judgment consequently is appealable, notwithstanding the one judgment rule and the unresolved state of the damage claims when it was entered. (*Highland Development Co.* v. *City of Los Angeles* (1985) 170 Cal.App.3d 169, 178-179 [215 Cal.Rptr. 881].)

[5]The court also rejected as untimely San Marino's offer of the legislative history of section 99, as compiled by the private legislative intent service. We have taken judicial notice of that material.

ANALYSIS

The issues presented concern the meaning and effect of sections 56828 and 99, and more particularly whether they impose upon defendants the duties the trial court directed them to discharge. (Code Civ. Proc., § 1085.) We review these questions de novo. (*Rodriguez* v. *Solis* (1991) 1 Cal.App.4th 495, 502 [2 Cal.Rptr.2d 50]; see *Evans* v. *Unemployment Ins. Appeals Bd.* (1985) 39 Cal.3d 398, 407-408 [216 Cal.Rptr. 782, 703 P.2d 122].)

Appearing separately and supported by 64 cities as amici curiae, San Marino and L.A. LAFCO contend that the trial court completely misconstrued the statutes in question. Defendants' position is that under sections 56828 and 99, L.A. LAFCO could not proceed to hear plaintiffs' application unless and until it issued a certificate of filing, which could not be issued until San Marino adopted a resolution agreeing to exchange property tax revenues with the county, and which, in turn, San Marino was not required by law to do. Plaintiffs dispute each of these propositions as a statutory matter, and contend that they would enable cities like San Marino unilaterally to obstruct the orderly, beneficial process of annexation, in contravention of public policy clearly recognized by the Supreme Court. We have determined, however, that the Legislature rather unequivocally has enacted precisely the system defendants contend, and that those enactments do not conflict with the Supreme Court's understanding and explication of legislatively established public policy.

We begin with the statutory language; the relevant portions of sections 56828 and 99 are set forth below.[6] On their face, they prescribe the following normal sequence of events. First, when an annexation application is

---

[6]Section 56828: ". . . [¶] (b) Immediately after receiving an application and before issuing a certificate of filing, the executive officer shall give mailed notice that the application has been received to each interested agency and each subject agency. The notice shall generally describe the proposal and the affected territory. . . . [¶] (c) . . . [¶] (d) Except when a commission is the lead agency pursuant to Section 21067 of the Public Resources Code, the executive officer shall determine within 30 days of receiving an application whether the application is complete and acceptable for filing or whether the application is incomplete. [¶] (e) The executive officer shall not accept an application for filing and issue a certificate of filing for at least 20 days after giving the mailed notice required by subdivision (b). . . . [¶] (f) If the appropriate fees have been paid, an application shall be deemed accepted for filing if no determination has been made by the executive officer within the 30-day period. . . . [¶] (g) When an application is accepted for filing, the executive officer shall immediately issue a certificate of filing to the applicant. A certificate of filing . . . shall specify the date upon which the proposal shall be heard by the commission. From the date of issuance of a certificate of filing, or the date upon which an application is deemed to have been accepted, whichever is earlier, an application shall be deemed filed pursuant to this division. [¶] (h) . . . [¶] (i) Following the issuance of the certificate of filing, the executive officer shall proceed to

filed, the LAFCO, before issuing a certificate of filing, gives notice to both the affected agencies (§ 56828, subd. (b)) and the county assessor and auditor (§ 99, subd. (b)). Second, the LAFCO reviews the application for completeness, and accepts it for filing either upon determining it is complete or, if 30 days expire, by operation of law. (§ 56828, subds. (d), (f).) Third, and perhaps overlappingly, the affected city and county commence a 30-day negotiation period to determine a property tax revenue exchange. (§ 99, subd. (d)(4).) Fourth, the LAFCO issues a certificate of filing of the accepted application and then sets it for a hearing within 90 days (§ 56828, subds. (g), (i)); however, the certificate may not be issued until the negotiating city and county adopt resolutions, within the 30-day period, agreeing to accept the property tax revenue exchange. (§ 99, subd. (b)(6).)

---

set the proposal for hearing and give published notice thereof as provided in this part. The date of the hearing shall be not more than 90 days after issuance of the certificate of filing or after the application is deemed to have been accepted, whichever is earlier. Notwithstanding Section 56106, the date for conducting the hearing, as determined pursuant to this subdivision, is mandatory."

Section 99: ". . . [¶] (b) Upon the filing of an application or a resolution pursuant to the Cortese-Knox Local Government Reorganization Act of 1985 [citation], but prior to the issuance of a certificate of filing, the [LAFCO] shall give notice of the filing to the assessor and auditor of each county within which the territory subject to the jurisdictional change is located. This notice shall specify each local agency whose service area or responsibility will be altered by the jurisdictional change. [¶] (1) (A) The county assessor shall provide to the county auditor, within 30 days of the notice of filing, a report which identifies the assessed valuations for the territory subject to the jurisdictional change and the tax rate area or areas in which the territory exists. [¶] (B) The auditor shall estimate the amount of property tax revenue generated within the territory which is the subject of the jurisdictional change during the current fiscal year. [¶] (2) The auditor shall estimate what proportion of the property tax revenue determined pursuant to paragraph (1) is attributable to each local agency pursuant to Section 96 or 97, and Section 98, notwithstanding Section 98.6. [¶] (3) Within 45 days of notice of the filing of an application or resolution, the auditor shall notify the governing body of each local agency whose service area or service responsibility will be altered by the amount of, and allocation factors with respect to, property tax revenue estimated pursuant to paragraph (2) which is subject to a negotiated exchange. [¶] (4) Upon receipt of the estimates pursuant to paragraph (3) the local agencies shall commence negotiations to determine the amount of property tax revenues to be exchanged between and among the local agencies. This negotiation period shall not exceed 30 days. . . . [¶] (5) . . . [¶] (6) Notwithstanding any other provision of law, the [LAFCO] shall not issue a certificate of filing pursuant to Section 56828 of the Government Code until the local agencies included in the property tax revenue exchange negotiation, within the 30-day negotiation period, present resolutions adopted by each such county and city whereby each county and city agrees to accept the exchange of property tax revenues. [¶] (7) In the event that the [LAFCO] modifies the proposal or its resolution of determination, any local agency whose service area or service responsibility would be altered by the proposed jurisdictional change may request, and the [LAFCO] shall grant, 15 days for the affected agencies pursuant to paragraph (4) to renegotiate an exchange of property tax revenues. Notwithstanding the time period specified in paragraph (4), if the resolutions required pursuant to paragraph (6) are not presented to the [LAFCO] within the 15-day period, all proceedings of the jurisdictional change shall automatically be terminated."

May the LAFCO proceed to hear and decide the application if, as here, the city does not agree to and adopt a revenue exchange? The straightforward import of the cited provisions is no: without such adoption there may be no certificate of filing (§ 99, subd. (b)(6)), and no hearing is to be set until a certificate of filing issues (§ 56828, subd. (i)). ■ But before considering whether these provisions mean something less, we address the overarching issue of whether the city is legally bound to agree to a tax revenue exchange. For if, as the trial court also concluded, the city is required and may be mandated to do so, any other statutory obstacles to LAFCO's processing the application disappear. Moreover, the city's entitlement vel non not to reach agreement most acutely implicates the "public policy" concerns that influenced the court below.

Whether a city subject to an annexation application must agree with its county to an exchange of property tax revenues has not been previously decided, but it has been the subject of an opinion of the Attorney General. In 71 Ops.Cal.Atty.Gen. 345 (1988) (hereafter AG Opn.), the Attorney General opined on three questions concerning annexation proceedings, the first of which was, "Are the city and the county required to reach an agreement for the transfer of property tax revenues?" (*Ibid.*) The Attorney General rendered a negative answer. His conclusion was based, in part, on the language of section 99, subdivision (b)(4), the only portion of the statutes in question to impose any requirements upon the annexing city. Again, that subdivision provides that upon receiving the auditor's estimates the city and county (or other local agencies affected) " 'shall commence negotiations to determine the amount of property tax revenues to be exchanged . . . .' " The Attorney General noted that although the language "shall" is mandatory, what it requires is not the attainment of agreement but the commencement of negotiations, and "[t]he duty to negotiate does not include the duty to agree. [Citations.]" (AG Opn., *supra*, at p. 348.)

The Legislature's choice of wording in this respect stands in distinct contrast to those that preceded it. As originally enacted in 1979 following the adoption of Proposition 13 (Cal. Const., art. XIII A), section 99, subdivision (b) required the affected agencies to "meet to determine" the tax revenue exchange. Later in 1979, the section was amended to provide they "shall determine" the matter. Then, in a complete revision of section 99 under Senate Bill No. 180, 1979-1980 Regular Session (hereafter Sen. Bill No. 180) in 1980, the present language ("commence negotiations") was added, together with the specification of a limited, 30-day "negotiation period." (§ 99, subd. (b)(4).)

Not only did the pre-1980 versions of section 99 employ more imperative language concerning the duties of cities, they also made it clear that a

property tax revenue exchange agreement was even then a precondition to a jurisdictional change. Before its 1980 revision, section 99, subdivision (b) stated in part: "Notwithstanding any other provision of law, no such jurisdictional change shall become effective until each county and city included in such negotiation agrees, by resolution, to accept the negotiated exchange of property tax revenues." (Cf. present § 99, subd. (b)(6), (7).)

Other aspects of the legislative history of section 99 indicate that the present requirement of negotiation was not intended to mandate agreement. First, in an analysis of Senate Bill No. 180 while it was pending, the Legislative Analyst characterized the effect of what became subdivision (b)(4) and (b)(6) as follows: "This bill would require the local agencies affected by a jurisdictional change to complete negotiations over the exchange of property tax revenues within a 30-day period following notification by the auditor of the amount of the property tax revenue subject to negotiated exchange. The [LAFCO] would not process the jurisdictional change *unless* the negotiating parties agree by resolution to an exchange of property taxes." (Legis. Analyst's Analysis, Sen. Bill No. 180, 1979-1980 Reg. Sess. (June 4, 1980), pp. 2-3, italics added.)

Even more informative is the April 14, 1980, Report of the Assembly Revenue and Taxation Committee on Senate Bill No. 180 (hereafter Rev. & Tax Com. Rep.), on which the Attorney General also relied in his opinion. (See AG Opn., *supra*, p. 348.) The report explained the bill's insertion of a 30-day period for the tax negotiations as follows: "Under present law, negotiations can drag on indefinitely. There is some feeling that such negotiations should be done timely, so all parties can know where they stand." (Rev. & Tax Com. Rep., *supra*, p. 4.) The report then added the following "[c]ommen[t]": "One of the problems with the transfer of property tax revenue . . . is that, in many cases, there have been protracted struggles among the participants and no agreements. Therefore, many worthwhile juris[d]ictional changes are being held up. *This bill does not address this impass[e] issue.* [¶] Perhaps the committee may wish to consider some type of arbitration where the last best offer of each party is submitted to a neutral, unbiased third party, who must choose one . . . or the other of the offers." (*Ibid.*, italics added.)

This report indicates that in considering the 1980 revision of section 99, subdivision (b), the legislators were conscious that existing law contained no requirement that the agencies subject to a proposed jurisdictional change reach agreement on a property tax revenue exchange, and that such an "impasse" would and did preclude processing and completion of the jurisdictional change proposal. Ultimately, the Legislature did act to rectify the

"drag[ging] on" of negotiations, by enacting section 99, subdivision (b)(4)'s 30-day negotiation period. But the Legislature did not further impose a mandatory "impasse-breaker" for such negotiations, except in one limited respect, not applicable to the present case.[7]

Illuminated by the foregoing legislative history, the language of section 99, subdivision (b)(4)—both what it says and what it does not say—clearly appears to signify that a city like San Marino, although charged with negotiating a property tax revenue exchange, is not required to reach or conclude an agreement to one, as the Attorney General determined. We now consider plaintiffs' two groups of arguments in opposition to this conclusion.

Plaintiffs first contend that the Legislature has explicitly repudiated the Attorney General's persuasive interpretation of section 99. Plaintiffs adduce Statutes of 1989, chapter 602 (Historical and Statutory Notes, 59 West's Ann. Rev. & Tax. Code (1993 pocket supp.) § 99, p. 80 [hereafter Chapter 602]), which provides: "Section 1. Any actions previously taken by a city, county, special district, or [LAFCO] . . . to implement Section 99 of the Revenue and Taxation Code for purposes of completing an exchange of property tax revenues in the case of a jurisdictional change are hereby confirmed, validated, and declared legally effective. [¶] Sec. 2. It is the intent of the Legislature that this act shall respond to the opinion of the Attorney General (No. 88-501, December 7, 1988) that property tax exchange agreements between local agencies not reached within a 30-day negotiating period are void."

This legislation did concern the Attorney General's opinion, but not the portion relevant here. The subject opinion was written in response to several distinct questions about annexations. Following the conclusion that section 99 did not impose a duty to agree, the Attorney General also opined that section 99, subdivision (b)(4)'s 30-day period for commencing and concluding negotiations was a mandatory limit, so that revenue exchange agreements reached and adopted after that time could not be effective. It was this aspect of the opinion that the Legislature "respond[ed] to" with the validation provision of Chapter 602. Whether or not that enactment had the effect

---

[7]Subdivision (h) of section 99, added in the 1980 revision, provides that if the public school authorities affected by a jurisdictional change do not agree to a property tax revenue exchange within 60 days after the change becomes effective, the determination shall be made by the county or state board of education (depending on whether the affected entities are in one or several counties). Without elaborating on the subject matter and procedural differences between this subdivision and those concerning annexations generally, it will suffice to recall the doctrine, previously cited in annexation law matters, "that 'Where a statute, with reference to one subject contains a given provision, the omission of such provision from a similar statute concerning a related subject is significant to show that a different intention existed.' " (*City of Port Hueneme* v. *City of Oxnard* (1959) 52 Cal.2d 385, 395 [341 P.2d 318].)

of generally repudiating the Attorney General's opinion about the mandatory nature of the 30-day limit, prospectively as well as retrospectively, it plainly did not either concern or "overturn" the opinion's distinct interpretation of section 99, subdivision (b) as not requiring the parties to an annexation proposal to reach agreement. Indeed, if any inference is to be drawn concerning that topic from the Legislature's outspoken awareness of the Attorney General's opinion, it would be that by refraining from further amending the statute on that subject the Legislature acquiesced in his interpretation. (Cf. *Cristmat, Inc.* v. *County of Los Angeles* (1971) 15 Cal.App.3d 590, 595 [93 Cal.Rptr. 325].)

Plaintiffs' second thrust of argument is that a construction of section 99 as allowing a city to forestall and "veto" an annexation proposal, by failing to agree to a revenue exchange, is untenable in light of the public policies that allegedly underlie the Cortese-Knox Act: of vesting primary authority over local reorganizations in an independent, countywide agency (LAFCO), and thus restraining affected entities from selfishly "vetoing" reorganizations, to the detriment of both compact local government organization and the welfare of citizens who inhabit areas that need new and further municipal support. This argument, which apparently motivated all of the trial court's statutory interpretation, relies on two Supreme Court decisions concerning the right to vote on reorganizations following their approval by LAFCO: *Citizens Against Forced Annexation, supra,* 32 Cal.3d 816, and *Board of Supervisors, supra,* 3 Cal.4th 903.

In *Citizens Against Forced Annexation,* residents of a city subject to an annexation proposal that had been approved by the LAFCO challenged as unconstitutional the provisions of the former reorganization law which, like present law, allowed only the inhabitants of the territory proposed to be annexed to call for and participate in an election to determine the ultimate fate of the proposal. After holding that these restrictions on the franchise of affected citizens required strict scrutiny, the court upheld them, finding that there existed several compelling state interests served by excluding city voters from the election, and that their exclusion was necessary to further one of those interests.

The interest so perceived was "avoiding the risk that unincorporated areas might be unable to obtain the benefits of municipal government and services if annexation was unattractive to residents of neighboring cities." (*Citizens Against Forced Annexation, supra,* 32 Cal.3d at p. 824.) The court found "it is in the interest of the state to facilitate such annexations even if the majority of residents of the annexing city are opposed, since otherwise

problem areas with a low tax base or a high cost of providing services might be unable to gain admission to any adjoining municipality." (*Id.* at p. 819.) After reviewing the purposes of the then reorganization law, which are not now demonstrably different, the court concluded its analysis with a passage, set forth below, which plaintiffs characterize as "an uncanny foreshadowing of the present case."[8]

In *Board of Supervisors, supra,* the court reconsidered under the Cortese-Knox Act the constitutional issue decided in *Citizens Against Forced Annexation.* This time the court held that the question should be decided under the rational basis test, because granting or withholding opportunities to vote on a reorganization fell within the state's broad power to provide for municipal restructuring. In thus departing from *Citizens Against Forced Annexation,* the court opined that if the restriction truly implicated the fundamental constitutional right to vote, the prior case had erred in holding that preventing neighboring voters from vetoing reorganizations was a compelling interest, because " 'the state cannot claim a compelling interest in excluding voters becaus e of how they may vote.' " (*Board of Supervisors, supra,* 3 Cal.4th at p. 920.) However, the court again upheld the rule, for reasons similar to its previous decision. Citing the statutory (§ 56001) policy of encouraging orderly growth through the logical formation of local boundaries, the court held: "[W]e conclude that section 57103 is fairly related to the Legislature's declared purpose, for, if large, relatively disinterested majorities could veto incorporations decided through the Cortese-Knox Act's elaborate process, the result might well hinder orderly growth and development." (*Board of Supervisors, supra,* at p. 923.)

The Supreme Court's pronouncements clearly signal the declared legislative importance of a unified, efficacious system of processing local reorganizations, through LAFCO's, to the end of assuring coherent local agency

[8]"The foregoing history indicates that the Legislature had determined that the goals of promoting orderly and logical community development, and of providing municipal services to newly urbanized regions, cannot adequately be met if city governments and their voters have a veto power over annexations approved by local agency formation commissions. The inconsistency between the legislative objectives and a municipal veto is especially acute in a case, such as the present Eastview annexation, in which the unincorporated territory contains primarily less expensive housing units and, lacking substantial commercial or industrial development, does not possess the tax base needed to incorporate as a new municipality. In such a case, the [LAFCO] may conclude that the logical step in orderly community development would be to permit the area to join a neighboring city. From the viewpoint of city residents, however, such annexation is an unattractive prospect since the cost of providing services to the affected area might exceed the tax revenues it would produce. Thus, if city voters or their elected representatives have the final decision on annexation, the result might be to leave 'orphan' islands of unincorporated territory rejected by all neighboring cities but lacking the financial resources for self-incorporation." (32 Cal.3d at p. 829.)

formation that will not be vulnerable to last-minute electoral "vetoes" by one-sided jurisdictional interests. However, notwithstanding the articulate language in *Citizens Against Forced Annexation* on which plaintiffs and the trial court relied (fn. 8, *ante*), neither that case nor the supervening *Board of Supervisors* stands for a "public policy" of forcing proposed reorganizations at their inception. The cases thus do not require rewriting section 99, which deals with a phase of the reorganization process different from that at issue in the two cases.

Plaintiffs' argument fails to appreciate the context of the holdings and analysis in *Citizens Against Forced Annexation* and *Board of Supervisors*. Both decisions concerned whether the Legislature had valid grounds to preclude an electoral "veto" of a reorganization at the very end of the process, after the LAFCO had approved the proposal and, at least under the current law appraised in *Board of Supervisors*, after the affected agencies had agreed to revenue exchanges. Although the de facto result would be the same upon a negative vote at the end or a failure to agree to a revenue exchange at the beginning (no reorganization), a much greater imbalance and frustration of the statutory scheme would be posed by allowing the annexing authorities literally to "veto" the LAFCO decision than would arise from requiring that their agreement on the vital matter of finances be obtained—or not obtained—at the outset. Indeed, in enacting section 99, subdivision (b)(4), the Legislature underscored and addressed the importance of reconciling the revenue exchange aspect at the outset—"so that all parties can know where they stand." (Rev. & Tax Com. Rep., *supra*, p. 4.)

The "public policy" identified in *Citizens Against Forced Annexation* and *Board of Supervisors* thus was not to require cities generally to agree to or be bound by reorganization proposals. Rather, the end sought to be advanced by the "no neighbor veto" provisions was the implementation of proposals that had run the gauntlet of the Cortese-Knox Act's LAFCO process. As the Supreme Court noted in *Board of Supervisors*, "by the time the question reaches the electorate the . . . proposal will already have undergone a labyrinthine process containing elaborate safeguards designed to protect the political and economic interests of affected local governments, residents, and landowners." (*Board of Supervisors, supra*, 3 Cal.4th at p. 912.)

Moreover, the public policy underlying the provisions at issue in the Supreme Court cases necessarily arose from, and appeared in, the legislation creating and describing that whole process. But, since its enactment as a part of that legislation, section 99 has always placed property tax revenue exchange agreement as an initial hurdle. Under the original, 1979 law,

"[n]otwithstanding any other provision of law" no jurisdictional change could become effective until the affected cities and counties agreed to the exchange. Since 1980, "[n]otwithstanding any other provision of law" the certificate of filing necessary for LAFCO to commence proceedings may not issue until such agreement occurs. And even at the point in the process where the Legislature has always withheld an electoral veto, section 99, subdivision (b)(7) still provides that if LAFCO modifies the original proposal, and the affected local agencies request renegotiation of the revenue exchange and do not again agree within 15 days, "all proceedings of the jurisdictional change shall automatically be terminated."

In sum, the Legislature has made it clear that, in pursuit of the beneficial purposes of reorganization, resolution of the fundamental fiscal question is a precondition, and this resolution must be mutual and consensual. That is the public policy concerning the subject matter at hand. And it is not in conflict with the high court's expressions in *Citizens Against Forced Annexation*, *supra*, about a different stage and feature of the reorganization process.

For all of the above reasons, we conclude that although section 99, subdivision (b) contemplates that the city and county affected by an annexation application will reach and adopt an agreement as to property tax revenues to be exchanged in the event the annexation becomes effective, the statute does not require the parties to do so, even though such agreement is a precondition to LAFCO's hearing and determining the application. The trial court therefore erred in mandating San Marino to adopt such an agreement with the county in respect of plaintiffs' Greenwood application.

▮ This does not end the inquiry. The trial court further held, and plaintiffs yet contend, that L.A. LAFCO would be statutorily obligated to hear plaintiffs' application even if San Marino did not agree to property tax revenue exchange. The court reached this conclusion in the "declaratory" portion of its judgment, by adopting interpretations of section 56828, subdivision (i) and section 99, subdivision (b)(6) that would render optional both the former's requirement of a certificate of filing before scheduling a hearing and the latter's preclusion of such a certificate absent a revenue exchange agreement. Both of these constructions are untenable.

Section 99, subdivision (b)(6) provides, again, that "[n]otwithstanding any other provision of law, the [LAFCO] shall not issue a certificate of filing pursuant to Section 56828 . . . until the local agencies included in the property tax revenue exchange negotiation, within the 30-day negotiation period, present resolutions adopted by each such county and city whereby

each county and city agrees to accept the exchange of property tax revenues." Plaintiffs contend, and the trial court held, that this language prohibits issuance of a certificate of filing only "within the 30-day negotiation period," and not after. Plaintiffs assert this is the meaning of the section if "[r]ead literally"; they further suggest that so read, the subdivision simply serves to prevent LAFCO's initial examination of the application, under section 56828, subdivisions (b)-(h), from getting ahead of the 30-day negotiation period.

This interpretation is groundless. In plain language, section 99, subdivision (b)(6)'s reference to the 30-day period modifies and limits not the LAFCO's issuance of a certificate but rather the city and county's adoption and presentation of revenue exchange resolutions. The statute does not purport to authorize a certificate of filing after that period. Indeed, what it does do is raise the question—a subject of the Attorney General's opinion and the 1989 validation law, Chapter 602—whether there may be any certificate of filing, and hence any further reorganization proceedings, after the 30-day period has expired, even if tax resolutions are thereafter adopted. Although we need not resolve that question here, it is plain that section 99, subdivision (b)(6) prohibits a certificate of filing before or absent an agreement on revenue exchange.

Even more strained is plaintiffs' and the trial court's construction of section 56828, as not necessarily requiring a certificate of filing as a precondition to LAFCO hearings at all. Plaintiffs first note that an application is deemed accepted for filing if the LAFCO does not act otherwise within 30 days (§ 56828, subd. (f)), and that the application is deemed filed on the date it is deemed accepted or on the date the certificate of filing issues, whichever is earlier (§ 56828, subd. (g)). Further, plaintiffs note, section 56828, subdivision (i) provides for a mandatory hearing date and states as follows: ". . . The date of the hearing shall be not more than 90 days after issuance of the certificate of filing or after the application is deemed to have been accepted, whichever is earlier. . . ." From these provisions, plaintiffs reason that there are two routes to a LAFCO hearing date: either by obtaining a certificate of filing or via the application having been deemed accepted for filing. Finally, plaintiffs contend, not only does section 56828 thus render the grant of a certificate of filing only an optional precondition to LAFCO hearing, but the Legislature must be viewed as having enacted this shortcut to break the "impasse" (Rev. & Tax Com. Rep., *supra*, p. 4) created if a city and county cannot reach agreement on revenue transfer.

Unfortunately, plaintiffs' and the trial court's construction fails to include and give effect to all the language of the statute. Section 56828, subdivision

(i) begins as follows: "Following the issuance of the certificate of filing, the [LAFCO] shall proceed to set the proposal for hearing and give published notice thereof as provided in this part." Thus, in no uncertain terms, the certificate of filing is what triggers the hearing requirement. The statute does create a difference between accepted and "deemed accepted" applications, as to when the hearing date must be, but it makes no such distinction with respect to the prerequisite of a certificate of filing before the hearing may be set. Indeed, section 56828, subdivision (g) prescribes that a certificate of filing shall be issued for all accepted applications, whether formally accepted or deemed accepted by operation of law under subdivision (f).[9]

In short, sections 56828 and 99 mean what they say. A certificate of filing is a precondition to LAFCO's hearing an application, and a property tax revenue agreement is a precondition to a certificate of filing. Absent either, the LAFCO is powerless to proceed further. The trial court therefore erred in mandating LAFCO to proceed to hear plaintiffs' annexation application.

A final matter remains. At the outset of its judgment, the court ordered that L.A. LAFCO reopen its file on the Greenwood application and give notice to the county assessor and auditor under section 99, subdivision (b), and that San Marino then negotiate with the county "in good faith" for a revenue exchange. Except for their timing, these mandates did reflect duties imposed by section 99, subdivision (b). ■ Although we have held that San Marino and cities like it are not under a statutory duty to reach agreement on the revenue question, section 99 undoubtedly contemplates that they enter into genuine and vigorous negotiations. Moreover, although we have held that the practical concerns expressed in *Citizens Against Forced Annexation, supra,* do not upset the meaning and intent of section 99, it remains true that the purposes of the Cortese-Knox Act would be thwarted if cities were to reject out of hand all proposals for annexation as to which "the cost of providing services to the affected area might exceed the tax revenues it would produce." (*Citizens Against Forced Annexation, supra,* 32 Cal.3d at p. 829.) In sum, we could well contemplate sustaining a writ of mandate requiring negotiation "in good faith" in the case of a city that engaged in the type of temporizing avoidance the record in this case intimates.

---

[9]To the extent plaintiffs' proposed statutory interpretations posit a legislative intent to "match" the 30-day negotiation period under section 99, subdivision (b) with the LAFCO's time for initial, prefiling review of an application under section 56828, they are arithmetically as well as textually unfounded. Section 56828 provides that an application will be reviewed and accepted for filing (or returned for completion) within 30 days after the LAFCO receives it. But under section 99, subdivision (b), the 30-day negotiation period may commence as late as 45 days or more after "the filing of an application." (§ 99, subd. (b)(3); see § 99, subd. (b)(4).)

However, to sustain the trial court's judgment insofar as it directs a resumption of negotiations based on current revenue information would require crossing two legal hurdles, at least one of which is insuperable. First, we would have to hold that section 99, subdivision (b)(4)'s 30-day period is not mandatory and exclusive, contrary to the Attorney General's opinion, to which the Legislature responded in 1989 by chapter 602. The parties have not devoted great attention to that potentially widespread question, and we do not propose to reach it if not absolutely necessary.

Second, and in any event, to order recommencing revenue negotiations on plaintiffs' 1990 application based on 1993 information would be to create and impose a hybrid duty not at all contemplated by the statutes under which plaintiffs have sought relief. This proceeding was commenced almost two years after San Marino and the county suspended negotiations. The only thing that we know has not changed in the interim is that plaintiffs are free to file a new annexation application, guided by the legal clarification of this decision, as well as by present local conditions. (Compare §§ 56855, 57090 [presumptive one- and two-year moratoria on renewal of application after denial by LAFCO or termination following LAFCO approval].) Because the particular duties imposed by the initial portion of the judgment are not among those "which the law [in question] specially enjoins" (Code Civ. Proc., § 1085), we find it inappropriate to affirm that portion of the judgment either.

### DISPOSITION

The judgment is reversed, and the superior court is directed to enter judgment denying the petition for mandate. The parties shall bear their own costs on appeal.

Boren, P. J., and Nott, J., concurred.

Respondents' petition for review by the Supreme Court was denied July 1, 1993.